[No. S026367. July 21, 1994.]

SIERRA CLUB et al., Plaintiffs and Appellants, v.
STATE BOARD OF FORESTRY et al., Defendants and Respondents;
PACIFIC LUMBER COMPANY, Real Party in Interest and Respondent.

COUNSEL

Towner & Lippe, Thomas N. Lippe and Bruce M. Towner for Plaintiffs and Appellants.

Sharon E. Duggan, Zach Cowan, Robert B. Maddow, Dianne K. Barry and Veronica Y. Fauntleroy as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, R. H. Connett and Walter E. Wunderlich, Assistant Attorneys General, M. Anne Jennings, Deputy Attorney General, and Clyde Small for Defendants and Respondents.

Ronald A. Zumbrun, Robin L. Rivett and Brad W. Dacus as Amici Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter, Frank Shaw Bacik, John A. Behnke, Cindee F. Mayfield and Jeffrey L. Anderson for Real Party in Interest and Respondent.

Pillsbury, Madison & Sutro, Alson R. Kemp, Jr., Walter R. Allan, Betsy G. Stauffer, Dun & Martinek, Daivd H. Dun, David E. Martinek, Nancy N. McDonough and David J. Guy as Amici Curiae on behalf of Real Party in Interest and Respondent.

OPINION

BAXTER, J.—Pacific Lumber Company submitted two timber harvesting plans covering old-growth forest in Humboldt County to the Department of Forestry (department). In response to a request by the Department of Fish and Game (Fish and Game), the department asked Pacific Lumber Company to provide information on old-growth-dependent wildlife species within the plan areas. Pacific Lumber Company refused to provide the requested information on the ground that it was not specified in the rules promulgated by the Board of Forestry (board). (Cal. Code Regs., tit. 14, § 895 et seq. [hereafter, sometimes, rules or forest practice rules].) The department then denied the plans on the ground that they were incomplete. Pacific Lumber Company appealed the department's denial to the board. The board approved the plans, ultimately finding that "there will not be any significant adverse effect on old-growth-dependent wildlife species or habitat from the harvesting that will occur under these two plans."

The legal issue before us, in its simplest form, is whether the board abused its discretion in approving the timber harvest plans. We conclude that the board did abuse its discretion when it evaluated and approved the plans on the basis of a record which lacked information regarding the presence in the subject areas of some old-growth-dependent species, information which both the department and Fish and Game had determined was necessary. By approving the plans without the necessary information regarding those species the board failed to comply with the obligation imposed on it by the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and the Z'Berg-Nejedly Forest Practice Act of 1973 (the Act or Forest Practice Act) (Pub. Resources Code, § 4511 et seq.).[1]

The evidentiary gap in the record which sparked this controversy stemmed from a disagreement between the department and the board over the department's authority to ask an applicant to obtain or provide information not specified in the forest practice rules. Although the rules have been amended to provide for the submission of information pertaining to old-growth-dependent species, eliminating this particular controversy, the department's authority to request information not specified in the rules remains a relevant concern for future cases. We therefore address that question and conclude that section 21160 does vest the department with the authority to require the submission of information not expressly specified in the rules if the information requested is necessary to enable the department to determine whether a timber harvesting plan will have a significant adverse impact on the environment. Only with that information is the department able to adequately discharge the obligation imposed upon it by the board: to determine whether a timber harvest plan incorporates feasible mitigation measures that substantially lessen the effects of the plan on the environment. (Cal. Code Regs., tit. 14, § 898.1, subd. (c)(1).)

Our conclusion that section 21160 gives the department direct authority to require the submission of information not specified in the rules does not, however, fundamentally alter the relationship between the department and the board: the board retains the ultimate power of approval over a plan and it may, in an appropriate case, approve a plan despite the significant adverse impacts on the environment that the department has identified, if the plan incorporates mitigation measures the board determines are feasible, and the board justifies the remaining impacts in light of specific social, economic, or other conditions. (§ 21002.)

Because the board approved the plans without having before it the data necessary to make an informed assessment of the environmental impact of

---

[1] All statutory references are to the Public Resources Code unless otherwise indicated.

the proposed timber harvest, that approval must be rescinded. We therefore affirm the judgment of the Court of Appeal.

I

FACTS

On February 16, 1988, the Pacific Lumber Company submitted two timber harvesting plans to the department for the logging of two separate stands of what Pacific Lumber Company's registered professional forester described as "virgin old-growth redwood-type forest." Timber harvesting plan 1-88-65 HUM covers 82 acres in the Yager Creek drainage basin in Humboldt County; timber harvesting plan 1-88-74 HUM covers 237 acres in the basin approximately 1 mile from the area covered by 1-88-65 HUM.[2] On February 18, 1988, the department returned timber harvesting plan 1-88-74 HUM to Pacific Lumber Company with the request that it provide additional information on certain aspects of the stand. This information was needed, according to the department, because the harvest area "appears to constitute habitat for old-growth-dependent species" and, if true, "the harvest could result in a significant adverse effect on these species."

On February 24, 1988, William Imboden, the chief of region 1 of the department, sent Pacific Lumber Company another letter clarifying the department's earlier request. Because the substance of the request is at the heart of this litigation, we quote the text of the letter in its entirety: "The above-referenced THP [timber harvesting plan] was returned prior to its being filed. In my letter of February 18, I indicated certain information must be provided before the plan would be acceptable for filing. On a 'post-it' label attached to the letter, I said we would be providing more information. [¶] The amount of old-growth habitat has diminished and the distribution of that habitat has been fragmented considerably in the past few years. According to the Department of Fish and Game, harvesting of these stands may have a significant impact on the following species: goshawk, Olympic salamander, tailed frog, red tree vole, Pacific fisher, spotted owl, and marbled murrelet. Without the additional information requested, the impact cannot be adequately evaluated. [¶] Since February 18, the Department of Fish and Game has clarified the kinds of information we are requiring to facilitate the adequate review of this plan. A potentially significant adverse effect has been identified. Therefore, according to 14 CCR [California Code of Regulations] 898, the Registered Professional Forester (RPF) must discuss alternatives to the proposed project, suggest mitigation, and explain

---

[2]The principal focus of the litigation has been on timber harvesting plan 1-88-74 HUM and our discussion, as a consequence, tends to emphasize that plan. Our analysis and conclusion, however, apply to both plans.

why any feasible alternatives to reduce significant effects were rejected. The RPF[']'s complete thought process should be demonstrated in the plan. He should explain what impacts there may be on the wildlife and why they are considered to be significant or insignificant. Appropriate mitigation measures and any feasible alternatives must be included. [¶] In order for you to complete the THP so that the Department of Forestry and Fire Protection can assess whether or not your proposed THP will have a significant effect on these vulnerable wildlife species, the following information would be necessary. [¶] Provide a wildlife survey of your proposed operating area and general vicinity done by a recognized wildlife professional. Species and their habitats to specifically address are the goshawk, Olympic salamander, tailed frog, red tree vole, Pacific fisher, spotted owl, and marbled murrelet. The survey report should contain a written description of the biological setting, including a vegetative map, a description of how the survey was done, an assessment of potential impacts to any of the species, and discuss harvesting alternatives or other measures to avoid jeopardizing any of the species. Important elements of the report should include a discussion of the proximity of the project to forage areas, an estimate of the downed logs, dominant trees and snags per acre, and whether the habitat contains any dens, nests, or talus slopes. [¶] The RPF should discuss the relative significance of the old-growth habitat which would be affected by the proposed THP to other old-growth habitat, e.g., isolated patch, part of a larger habitat or a link between habitats. A map of other old-growth habitats in your ownership within the general vicinity should be included. [¶] The RPF must discuss past, present and future activity in the drainage and how it might affect the wildlife habitat. Future operations should be limited to those projects that are reasonably foreseeable. A good guideline is to disclose those future projects where preliminary field work has been started, but a formal THP has not been prepared and submitted to the California Department of Forestry and Fire Protection. [¶] You may resubmit your plan with the above information."

While the department was clarifying its request, Pacific Lumber Company was simultaneously responding to the department's initial letter, stating that it "cannot agree to provide the information you have requested, as it would establish a very inappropriate precedent . . . . [¶] In our opinion, the Rules of the Board determine what information is required from the THP submitter, and your request is greatly in excess of what is required by the Rules."

Both plans were accepted for filing on March 3, 1988, without the submission of the additional information. In a letter notifying Pacific Lumber Company's registered professional forester of the need for a preharvest inspection, however, the department included Fish and Game's request for

substantially the same information the department had earlier requested and Pacific Lumber Company had earlier refused to provide. Preharvest inspections were conducted by Fish and Game personnel accompanied by Pacific Lumber Company foresters on March 11 and March 21, 1988. The report by Fish and Game advised that there were no fish-bearing streams in the plan area and that the natural diversity data base had no record of either classified wildlife species or species of special concern being reported in the area, but the distinctive wildlife habitat characteristics for old-growth-dependent species were present. That report concluded that the plan area could be managed to provide and maintain quality habitat for those species, but that the plan submitted would result in significant impact on those species which were present. The report recommended that the silviculture system utilized in harvesting the area provide for adequate habitat maintenance.

On March 25, 1988, after the preharvest inspection of the 1-88-74 HUM area, Fish and Game itself made a more detailed request for the information from Pacific Lumber Company. On March 31, 1988, Pacific Lumber Company, acting through its registered professional forester, Robert Stephens, provided some of the information requested, but refused to undertake new surveys of old-growth-dependent wildlife on its property. It did provide information on the presence of the tailed frog and the Olympic salamander from a survey it had already performed. In a subsequent report, Fish and Game acknowledged that Pacific Lumber Company's forester had provided data on the occurrence of amphibians in the plan area and had "made a good first step" toward developing mitigation measures. Those measures would include leaving a portion of the old growth character of the stand, providing wide stream protection zones, abstaining from use of fire for site preparation, and retaining cull Douglas fir trees and a portion of the "vertical and down structure" in the stand. Fish and Game was, nonetheless, dissatisfied because, absent data on the presence of the red tree vole, marbled murrelet, goshawk and spotted owl in the area, it could not make a site-specific recommendation of mitigation measures.

On April 19, 1988, the department denied both timber harvesting plans on the ground that "information contained in the plans you have submitted is incomplete in a material way. This conclusion is based on the request from the Department of Fish and Game, John Hummel, for wildlife surveys and the need to know of the presence or absence of old-growth dependent species in order to make adequate mitigation if those species exist in the [timber harvesting plan] areas." Pacific Lumber Company appealed the department's denial of the plans to the board.

In a hearing before the board on May 20, 1988, the department dropped its request for information in the "general vicinity" of the timber harvesting

plan area, and confined its request to surveys of the old-growth-dependent wildlife on the plan property. On June 8, 1988, the board overturned the director's denial of the plans, finding that both plans were "in conformance with the rules and regulations of the Board of Forestry." The board, accordingly, "approve[d] the plans based on the record before the Director of the California Department of Forestry and Fire Protection." In its statement of reasons, the board concluded that it "is unable to determinatively say whether there will or there will not be significant adverse effects on old-growth-dependent wildlife species or habitat from harvesting that will occur under these two plans. The best that we can say is that the [Department of Fish and Game], the state agency responsible for protection of wildlife, believes that there may be possible significant effects, whereas other reputable experts for [Pacific Lumber Company] believe that there will not be. At best, the information is uncertain and speculative (based on available information). Given [Pacific Lumber Company's] efforts to date, and the fact that the issue of the effects on old-growth-dependent species will still remain debatable, even with the additional surveys, it is unreasonable to request further information."

The board based its decision in part on the speculative nature of the Fish and Game belief that old-growth-dependent species were present in the plan area, the failure of Fish and Game to offer any factual basis for believing that removal or disturbance of the old growth forest on Pacific Lumber Company lands would significantly limit the range or habitat of indicator species, and that department's failure to recommend additional mitigation measures on the assumption that such species were present. The board concluded, however, that it did have sufficient information on which to assess mitigation measures.

On June 16, 1988, the Sierra Club and the Environmental Protection Information Center, Inc., filed a petition for writ of mandate seeking an order compelling the board to withdraw its approval of these two timber harvesting plans. The petition alleged, inter alia: (1) that the board had abused its discretion in approving these plans because neither plan incorporated all feasible mitigation measures that would lessen the significant adverse environmental effects of the plan; and (2) that by either failing to perform an evaluation of the adverse effects of the plan itself or failing to require that Pacific Lumber Company perform such an evaluation, the board violated both its own rules and the requirements of the CEQA. The trial court concluded that the board had failed actually to determine whether harvesting under these two plans would have significant adverse effects on "old-growth-dependent species habitat." On February 9, 1989, the trial court returned the plans to the board and requested that it answer the following

questions: (1) Will the harvests cause an adverse impact? (2) What are the mitigation measures suggested by Fish and Game that should be implemented before these harvests occur? (3) If the plans cause an adverse environmental impact, is it overcome by economic considerations?

On March 20, 1989, the board filed its supplemental findings. It concluded that approval of both plans will not produce a significant effect on the environment, and further found "that there will not be any significant adverse effect on old-growth-dependent wildlife species or habitat from the harvesting that will occur under these two plans." A later statement in the supplemental findings provided: "The Board has evaluated the information provided in the THP record and the May 20, 1988 and June 8, 1988 hearing and found that there was no determinative evidence presented for reaching the conclusion that significant adverse effects will result to wildlife." The board's conclusion that these plans had no adverse impact on old-growth-dependent wildlife obviated its need to specify additional mitigation measures. The board noted, however, the existing mitigation measures that would lessen the plans' impact on wildlife: the modified selection silvicultural system would lessen the impact on 200 acres of the plan area, leaving approximately half the trees in that area that could be used for habitat; watercourse protection zones would protect the integrity of the streams, keeping them as habitat for aquatic species; the decision not to use fire for site preparation would retain vegetative cover necessary for some of the species; and the retention of some downed trees would provide habitat for cavity dwellers. The board specifically found that it "was not appropriate to require extensive or costly species-wide surveys by forest landowners in an effort to address wildlife effects which are speculative."

Because the board found that the plans caused no significant adverse impact on the environment, the board found it unnecessary to consider whether those adverse impacts were overcome by economic considerations. The board also noted that, under its rules, protection would be provided during the actual timber harvesting, and "[s]hould additional potential significant adverse impacts either site specific or cumulative, to resources protected by the rules, be identified . . . the plan is required to be amended to reflect feasible protection for those resources."

The trial court, after receiving the board's supplemental findings, denied the petition for writ of mandate on October 23, 1989.[3] The Court of Appeal stayed timber operations pending its review of the case, and addressed the issue as only whether the department could require the additional survey.

[3]The trial court vacated the submission of the case on June 9, 1988, so that the board might consider whether the listing of the northern spotted owl as a threatened species under the

Concluding that the department had the power to do so, the Court of Appeal reversed the judgment of the trial court and remanded the matter to the superior court with instructions to issue a peremptory writ of mandate directing the board to rescind its approval of both timber harvesting plans. We granted Pacific Lumber Company's petition for review.

## II

### STATUTORY BACKGROUND

Timber harvesting operations in this state must be conducted in accordance with the provisions of the Forest Practice Act. The Act was intended to create and maintain a comprehensive system for regulating timber harvesting in order to achieve two goals: (1) to ensure that "[w]here feasible, the productivity of timberlands is restored, enhanced, and maintained"; and (2) to ensure that "[t]he goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, . . . and aesthetic enjoyment." (§ 4513.) The Act vests in the board the obligation to adopt forest practice rules and regulations specific to the various forest districts of the state in order "to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources, including, but not limited to, streams, lakes, and estuaries." (§ 4551.)

Actual timber operations are controlled by means of a site-specific timber harvesting plan that must be submitted to the department before timber operations may commence. (§§ 4581 and 4582.5.) The Legislature has specified that the plan include the name and address of the timber owner and the timber operator, a description of the land upon which the work is proposed to be done, a description of the silviculture methods to be applied, an outline of the methods to mitigate erosion caused by operations performed in the vicinity of a stream, the provisions, if any, to protect any "unique area" within the area of operations, and the anticipated dates for commencement and completion of operations. (§ 4582, subds. (a)-(g).) In addition, the plan must include "[a]ny other information the board provides by regulation to meet its rules and the standards of this chapter." (§ 4582, subd. (j).)

The director of the department reviews the plan "to determine if [it] is in conformance with the rules and regulations of the board and with [the provisions of] this chapter." (§ 4582.7.) If the director determines that the

Endangered Species Act, 16 United States Code section 1500 et seq., affected its supplemental findings. The board concluded that the listing did not.

plan does not conform to the rules and regulations of the board and with the other provisions of the Act, he or she must return the plan, indicating the reasons for the return and advising the plan submitter of his or her right to a public hearing before the board. Any appeal to the board must be filed within 10 days from the receipt of the returned plan, and the board must rule on the appeal within 30 days from the date it was filed, unless the parties agree to a later date. (*Ibid.*) The board reviews the plan to determine whether it conforms to the rules and regulations of the board and the provisions of the Act itself. (*Ibid.*)

Three statutes are relevant to the director's decision to approve a timber harvesting plan. Section 4583 requires, in part, that a timber harvesting plan "conform to all standards and rules which are in effect at the time the plan becomes effective." Section 4582.75 provides that "[t]he rules adopted by the board shall be the only criteria employed by the director when reviewing timber harvesting plans pursuant to Section 4582.7." Finally, section 4555 permits the director of the department to withhold a decision on a timber harvesting plan if he or she determines "that a substantial question exists concerning whether the intent of this chapter is currently provided for by the rules and regulations of the board, and that approval of a timber harvesting plan which has been filed could result in immediate, significant, and long-term harm to the natural resources of the state." The director must notify the board of the decision to withhold approval and the board must then determine, after a public hearing, whether "the intent of this chapter has been provided for in the rules and regulations of the board." That determination is conclusive. (§ 4555.) If the board determines that, indeed, "the intent of [the Act] has not been provided for in the rules and regulations," the board shall act to amend the rules by emergency regulation, and the director then reviews the submitted plan against the revised regulations. (*Ibid.*)

### III

#### THE DEPARTMENT'S AUTHORITY TO REQUEST INFORMATION NOT SPECIFIED IN THE RULES

The uncertainty reflected in the record as to the presence or absence of old-growth-dependent species stemmed in part from a disagreement between the department and the board as to the department's authority to request, and the board's power to demand as a condition of approval of a timber harvest plan, information not specified in the forest practice rules. Although the rules have been amended to provide for the submission of

information on the presence of old-growth-dependent species in appropriate cases (Cal. Code Regs., tit. 14, § 1034, subd. (w)), eliminating this particular controversy, the department's authority to request other types of information not specified in the rules remains a relevant concern for future cases. The Forest Practice Act does not expressly grant the department the authority to request information not expressly specified by the rules, nor do the rules themselves. We note, however, that even in its 1988 rules, the board had imposed upon the department (acting through its director) the obligation to disapprove those plans that did not incorporate "silvicultural systems, operating methods and procedures" that would substantially lessen significant adverse impacts on the environment. (Cal. Code Regs., tit. 14, § 898.1, subd. (c)(1).) The department cannot discharge its obligation to disapprove plans that do not incorporate feasible measures to reduce the significant adverse effects of the plan on the environment if it is unable to identify those significant adverse impacts due to a lack of information. Therefore, by vesting the department with the authority to determine whether timber harvesting plans incorporate the measures specified by the board to reduce significant impacts, the board impliedly vests the department with the authority to secure the information that it needs to make that determination.

Because we conclude that section 21160, a CEQA provision, gives the department express authority to request information that it needs to identify the significant adverse impacts of a timber harvesting plan, we need not rely on the department's implied authority alone. Section 21160 provides, in its relevant part, that "[w]henever any person applies to any public agency for a lease, permit, license, certificate, or other entitlement for use, the public agency may require that person to submit data and information which may be necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment or to prepare an environmental impact report." The department is the public agency initially charged with the duty of determining whether or not a proposed timber harvesting plan incorporates feasible silvicultural systems, operating methods, and procedures to substantially lessen significant adverse impacts on the environment. (Cal. Code Regs., tit. 14, § 898.1, subd. (c)(1).) Section 21160, by its express terms, therefore authorizes the public agency—here, the department—to request from the plan submitter the information that it needs to satisfy its obligations under the rule.

Our conclusion rests on the fundamental assumption that in approving timber harvesting plans, the board must conform not only to the detailed and exhaustive provisions of the Act, but also to those provisions of CEQA from which it has not been specifically exempted by the Legislature. Because the applicability of CEQA to the timber harvesting industry appears to be an

issue which recurs with some frequency in the courts of this state, we review our conclusion in some detail.

In section 21000 of CEQA, the Legislature expressly declared its intent "that *all* agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." (§ 21000, subd. (g), italics added.) In 1976, the Legislature clarified how public agencies were to discharge their obligations under CEQA: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." (§ 21002.)

■ We have stated that the environmental impact report (EIR) is "the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' (§ 21000, subd. (a).)" (*Laurel Heights Improvement Assn.* v. *Regents of the University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) The environmental impact report is " 'the heart of CEQA' " and the "environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*Ibid.*) It is intended, further, " 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' " (*Ibid.*) "Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. . . . The EIR process protects not only the environment but also informed self-government." (*Ibid.*)

An EIR is not required for all projects subject to governmental approval, however. The Legislature has provided that the Secretary of the Resources

Agency may certify a regulatory program of a state agency as exempt from the requirement of EIR preparation *if* the program requires that a project be preceded by the preparation of a written report containing certain information on the environmental impacts of the project. (§ 21080.5, subd. (a).) To qualify for such certification, the regulatory program must be governed by rules and regulations that: (1) require that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen any significant adverse impact the activity might have on the environment (§ 21080.5, subd. (d)(2)(i)); (2) that include guidelines for the preparation of the project plan and for an evaluation of the proposed activity "in a manner consistent with the environmental protection purposes of the regulatory program" (§ 21080.5, subd. (d)(2)(ii)); (3) that require the administering agency to "consult with all public agencies which have jurisdiction, by law, with respect to the proposed activity" (§ 21080.5, subd. (d)(2)(iii)); and (4) that require that "final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process." (§ 21080.5, subd. (d)(2)(iv).) The document that functions as the equivalent of an EIR must also include a description of the proposed activity, its alternatives, and mitigation measures to minimize any significant adverse environmental impact, and must be available for a reasonable time for review and comment by other public agencies and the general public. (§ 21080.5, subd. (d)(3).)

In January of 1976, pursuant to the provisions of section 21080.5, subdivision (a), the Secretary of the Resources Agency certified the regulatory scheme created by the Forest Practice Act. Under the terms of section 21080.5, subdivision (c), that certification expressly exempts the timber harvesting plan process from the provisions of chapters 3 and 4 and section 21167 of CEQA. (§ 21080.5, subd. (c).) Chapters 3 and 4 deal, in large part, with the various requirements of an EIR at both the state level (chapter 3) and the local level (chapter 4). Section 21167 sets forth the time within which an action challenging a public agency's decision under the provisions of CEQA must be filed.

Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537].) CEQA is a legislative act, and the Legislature both had and retains the authority to limit the projects to which CEQA applies. It has specified in section 21080 those projects that are categorically exempt from CEQA. (§ 21080, subd. (b)(1)-(16).) Moreover, it has vested in the Secretary of the

Resources Agency the authority to identify those projects that do not, as a class, have a significant effect on the environment and which are, as a consequence, exempt from the provisions of CEQA. (§ 21084, subd. (a).) The Legislature has not included timber harvesting operations within any of the classes of projects that are exempt from CEQA under sections 21080 and 21084.[4] We therefore reject Pacific Lumber Company's assertions that timber harvesting is "exempt" from CEQA. Section 21080.5 compels instead the conclusion that timber harvesting in this state is exempt only from chapters 3 and 4 of CEQA and from section 21167 of that act.

Timber harvesting, then, is subject to the Legislature's declaration in section 21160 that "[w]henever any person applies to any public agency for a lease, permit, license, certificate, or other entitlement for use, the public agency may require that person to submit data and information which may be necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment . . . ."[5]

■ Pacific Lumber Company, joined by various amici curiae, argues that section 4582.75 precludes the department from requesting information not expressly specified in the forest practice rules. Section 4582.75 provides: "The rules adopted by the board shall be the only criteria employed by the director when reviewing timber harvesting plans pursuant to Section 4582.7." A request for information, however, is not a criterion by which a plan is reviewed. Section 4582.75, as demonstrated below, was enacted

---

[4]We find it significant that after the passage of the Forest Practice Act in 1973, the Legislature enacted section 4514.3 as an emergency measure, filed with the Secretary of State on June 30, 1975, and having immediate effect, declaring that "[t]he provisions of Division 13 (commencing with Section 21000 [of the Public Resources Code]) do not apply to the preparation, review, or approval of timber harvesting plans and amended plans until January 1, 1976 . . . . [¶] This section shall not be construed by implication as either authorizing or requiring the preparation of an environmental impact report after January 1, 1976, with respect to a timber harvesting plan." (Stats. 1975, ch. 174, § 1, p. 327.) The immediate effectiveness of the act was justified "[i]n order to avert serious uncertainty with resultant delay and detrimental effects to industry and to the economy of the state, and to better protect resources important to the public welfare . . . ." (*Id.*, § 2, p. 327.) While the emergency measure was in effect, the Legislature failed to adopt and to enact into law four bills introduced in 1975 which were designed to accord a permanent exemption from the provisions of CEQA for the preparation, review, acceptance and approval of timber harvesting plans. (Sen. Bill No. 477; Assem. Bill Nos. 328, 655, 838.) A fifth bill introduced in 1975 (Sen. Bill No. 707) was enacted into law as section 21080.5 (Stats. 1975, ch. 1187, § 1, p. 2931). That section, as noted above, exempts "certified . . . regulatory program[s]," including the timber harvesting plan process, only from certain provisions of CEQA, most notably those governing EIR's.

[5]We reject Pacific Lumber Company's assertion that this section applies only to EIR's as unsupported by the text of the section itself, which is phrased in the conjunctive: the public agency is authorized to secure information necessary *either* to determine whether the proposed project may have a significant effect on the environment or to prepare an EIR.

to curtail the department's ability to make forest policy decisions outside the scope established by the board. Vesting the department with the ability to request information does not permit the department to make decisions outside the scope of the board's rules.

Section 4582.75 (Stats. 1977, ch. 930, § 3, p. 2844) was added to the Public Resources Code with section 4555 (Stats. 1977, ch. 930, § 2, pp. 2843-2844) and an amendment to section 4552 (Stats. 1977, ch. 930, § 1, p. 2843). Prior to the 1977 amendment, section 4552 provided only that "[t]he rules and regulations adopted by the board shall be based upon a study of the factors that significantly affect the present and future condition of timberlands and shall be used as standards by persons preparing timber harvesting plans." The amendment added the sentence, "In those instances in which the board intends the director to exercise professional judgment in applying any rule, regulation, or provision of this chapter, the board shall include in its rules standards to guide the actions of the director, and the director shall conform to such standards, consistent with Section 710 [which prohibited the director from amending or repealing any regulation or directive of the board]." Section 4555 provided that if the director "determines that a substantial question exists concerning whether the intent of this chapter is currently provided for by the rules and regulations of the board," and a proposed THP (timber harvesting plan) involving that question would, if approved, result in "immediate, significant, and long-term harm" to the environment, the director could withhold approval of the plan pending a public hearing of the board at which the board could enact an emergency regulation to address and resolve the question presented by the director.

Section 4582.75, providing that the rules would be the sole criteria employed by the director in reviewing timber harvesting plans, was added to limit the department director's discretion in reviewing timber harvesting plans. Its purpose is to assure that the director operates within the forest policies established by the board and articulated in the forest practice rules. (*Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 619 [216 Cal.Rptr. 502].) In other words, the director of the department is not to approve or disapprove timber harvesting plans based on his or her own conception of what is good forest policy, but rather, based on the board's conclusions. Hence, the board's rules provide that the director of the department "may only require incorporation into the plan of mitigation measures that are based on rules of the Board." (Cal. Code Regs., tit. 14, § 1037.5, subd. (f).)

As we stated above, however, a request for information is not a *criterion* for reviewing a timber harvesting plan, but is instead a prerequisite to

application of the criteria established by the board, in particular, that rule requiring the director to disapprove those plans which do not incorporate procedures to substantially lessen significant adverse impacts on the environment. (Cal. Code Regs., tit. 14, § 898.1, subd. (c)(1).) The director of the department cannot discharge that obligation until the significant adverse impacts of the timber harvesting operation have been identified.

A construction of section 4582.75 that permits the director of the department to require the submission of information not otherwise specified in the rules does not upset the respective functions of the department and the board, since the information requested must be relevant to the manner in which the criteria expressed in the rules are applied, and the board retains the power to approve a plan that has significant adverse effects upon the environment, so long as it justifies its action in light of "specific economic, social, or other conditions." (§ 21002.) CEQA requires that the board identify the adverse effects of the proposed project before it exercises that power, however.

CEQA compels government first to identify the environmental effects of projects, and then to mitigate those adverse effects through the imposition of feasible mitigation measures or through the selection of feasible alternatives. It permits government agencies to approve projects that have an environmentally deleterious effect, but also requires them to justify those choices in light of specific social or economic conditions. (§ 21002.) The board cannot, as a practical matter, anticipate each and every significant adverse effect of timber harvesting, and therefore cannot promulgate rules that require the submission of all relevant information from timber harvest plan submitters. It is through the agency of the department that the board acquires the information on the impacts of timber harvesting that forms the basis for new rules.

The Legislature appears to have expressly contemplated the information-gathering role of the department in section 4582.6: "Upon receipt of the timber harvesting plan, the department shall place it . . . in a file available for public inspection . . . and, for the purpose of interdisciplinary review, shall transmit a copy to the Department of Fish and Game, the appropriate California regional water quality control board, county planning agency, and, if the area is within its jurisdiction, the California Tahoe Regional Planning Agency . . . . The department shall invite, consider, and respond in writing to comments received from public agencies to which the plan has been transmitted and shall consult with those agencies at their request." (§ 4582.6, subd. (a).) For that consultation to be meaningful, the department must have the power to compel the applicant to obtain and produce relevant information requested by the participating agencies.

In summary, we find that a reading of section 4582.75 that authorizes the department to require the production of relevant information not specified in the rules furthers the ultimate purpose of both CEQA and the Act, and permits the director of the department to meaningfully discharge his or her obligations under the rules of the board itself.

We recognize that the Legislature cannot have intended the department to have unfettered discretion in the type of information that it may require. Section 21160 limits the agency's power to compel information to that "data and information which may be necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment . . . ." To comply with the requirements of this section, the information sought by the department must be information that will reveal effects of timber harvesting that can be fairly described as "significant." Section 21068 defines "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in the environment."

In this case, Fish and Game initially determined that the harvesting of old-growth timber had the potential to adversely affect a number of species determined by the department to be dependent upon old-growth timber stands for their habitat. Fish and Game is the agency of the state charged with conservation and maintenance of the wildlife resources of the state (see Fish & G. Code, §§ 1801, 702), and its conclusions as to the possible effects of timber harvesting on wildlife must be considered by the board. This is consistent with the express goals of CEQA, which include preventing the elimination of fish or wildlife species due to man's activities, ensuring that fish or wildlife populations do not drop below self-perpetuating levels, and preserving for future generations representations of all plant and animal communities and examples of the major periods of California history. (§ 21001, subd. (c).) The possible destruction of both old-growth-dependent species and their habitat from the harvesting of old-growth timber can therefore be fairly described as significant and adverse. The information required by the department was reasonably related to those impacts: the department sought surveys of the property to determine if old-growth species were on the property, and, if so, where they were located. This information reveals whether the harvesting of the timber would affect old-growth species and is therefore within the department's authority.

Pacific Lumber Company contends that a construction of section 4582.75 which permits the director to request information that cannot be readily acquired by the plan submitter violates the speedy time frames of section 4582.7 and section 4604. Section 4604 requires that the department conduct any preharvest inspection within 10 days from the date the timber harvest

plan is filed; section 4582.7 provides that the director has 15 days from the date the preharvest inspection is completed (or, if the director determines that no preharvest inspection is necessary, 15 days from the date the plan is filed) within which to review the plan and take public comments, and 10 days beyond that 15-day period within which to determine whether the plan conforms to the rules and regulations of the board and to the provisions of the Forest Practice Act. (See also, Cal. Code Regs., tit. 14, § 1037.4.)

The rules promulgated by the board, however, indicate that the time frames established by sections 4582.7 and 4604 are intended to apply to timber harvesting plans that have been determined by the director to be complete. Rule 1037 gives the director of the department 10 days from the receipt of a plan within which to determine if the plan is "accurate, complete, and in proper order." Only if the plan satisfies these criteria is it filed; if the director determines that the plan is inaccurate, incomplete, or otherwise not in proper order, it is not filed and must be returned to the submitter with written specifications of the deficiencies. A plan submitter that resubmits its plan without remedying the deficiencies identified by the director risks disapproval of the plan: rule 898.2 vests the director with the authority to disapprove a plan if there is evidence that the information contained in the plan is incorrect, incomplete, or misleading in a material way. (Cal. Code Regs., tit. 14, § 898.2, subd. (c).) Similarly, if the director determines that additional information is needed after a timber harvesting plan has been filed, section 4582.7 permits an extension of the review time upon the agreement of the parties; while the plan submitter is free to refuse an extension, that refusal might well result in disapproval of the plan on the ground that it is incomplete.

We therefore conclude that the time frames established in sections 4582.7 and 4604 do not preclude the department from exercising the information-gathering powers granted to it under section 21160.

IV

DID THE BOARD ABUSE ITS DISCRETION BY APPROVING THESE PLANS?

■ The board performs an adjudicatory function in approving or rejecting a timber harvest plan following an appeal from the director's return of the plan to the submitter. The board is required to hold a public hearing to review the plan to determine if it conforms to the rules and regulations of the board and the Forest Practice Act. (4582.7.) Its order is therefore subject to judicial review under the mandate procedure established by Code of Civil Procedure section 1094.5. The inquiry, in such review here, is whether the

board abused its discretion in approving these plans. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*; see also, § 21168.5.) Only if the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively prejudicial, as when the department or the board fails to comply with mandatory procedures, must the decision be set aside, however. (*Environmental Protection Information Center, Inc.* v. *Johnson, supra,* 170 Cal.App.3d 604, 622.)

■ Because the board believed that gathering the additional information sought by the department could not be required of Pacific Lumber Company, it evaluated the timber harvest plans based solely on the information already in the record. The mandate proceeding and, ultimately, this appeal therefore require that the court first determine whether the board or department failed to comply with mandatory procedures of CEQA and the Forest Practice Act. As noted earlier, that record contained no site-specific data regarding the presence of four old-growth-dependent species, the red tree vole, the marbled murrelet, the goshawk, and the spotted owl, and indicated that neither the department nor Fish and Game had made site-specific recommendations regarding mitigation measures.

In evaluating and approving the timber harvest plan in the absence of such data and recommendations the board failed to proceed in the manner prescribed by CEQA. The record confirms that Fish and Game had reasonably determined that the proposed timber harvest could have a significant adverse effect on the old-growth-dependent wildlife habitat. Therefore, the board, through the department, had an obligation imposed by CEQA to collect information regarding the presence of old-growth-dependent species on the site of the proposed timber harvest. Without that information the board could not identify the environmental impacts of the project or carry out its obligation to protect wildlife as required by the Forest Practice Act (§ 4551), and to prevent environmental damage by refusing to approve projects if feasible mitigation measures are available which will avoid or substantially lessen significant environmental effects as required by CEQA. (§§ 21000, 21002.) When it nonetheless approved the plan, the board failed to proceed in the manner prescribed by the Forest Practice Act and CEQA.

The failure of the board to proceed as required by law was prejudicial. The absence of any information regarding the presence of the four old-growth-dependent species on the site frustrated the purpose of the public comment provisions of the Forest Practice Act. (§§ 4582.6, 4582.7.) It also

made any meaningful assessment of the potentially significant environment impacts of timber harvesting and the development of site-specific mitigation measures impossible. In these circumstances prejudice is presumed. (See *East Peninsula Ed. Council, Inc.* v. *Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 [258 Cal.Rptr. 147]; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1023 [192 Cal.Rptr. 325].)

## V

### DISPOSITION

The judgment of the Court of Appeal directing the superior court to issue a peremptory writ of mandate compelling the board to rescind its approval of timber harvesting plans 1-88-65 HUM and 1-88-74 HUM is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., and Werdegar, J., concurred.