TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 95-902 |
| of | : | |
| | : | September 11, 1996 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE DICK MONTEITH, MEMBER OF THE CALIFORNIA STATE SENATE, has requested an opinion on the following question:

As a condition for issuing a timber harvesting permit, may the Department of Forestry and Fire Protection require a property owner to submit a comprehensive flora and fauna survey of the property?

CONCLUSION

As a condition for issuing a timber harvesting permit, the Department of Forestry and Fire Protection may not require a property owner to submit a comprehensive flora and fauna survey of the property.

ANALYSIS

The Department of Forestry and Fire Protection ("Department") is part of the Resources Agency and is under the control of an executive officer known as the Director of Forestry and Fire Protection ("Director"). (Pub. Resources Code, § 701.)[1] Within the Department is the State Board of Forestry ("Board"), comprised "of nine members appointed by the Governor, subject to confirmation by the Senate." (§ 730.)

The question presented for resolution concerns the responsibilities of the Department, Director, and Board in issuing timber harvesting permits. Specifically, may a property owner be

_____

[1]All references hereafter to the Public Resources Code are by section number only.

1. 95-902

required to submit a comprehensive flora and fauna survey of his or her property in order to receive a permit to harvest the timber? We conclude that such a survey is not authorized under the two controlling statutory schemes or implementing administrative regulations.

1.     The Z'berg-Nejedly Forest Practice Act of 1973

It must initially be determined whether a comprehensive flora and fauna survey may be required under the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (§§ 4511-4628; "Act"). The Legislature has expressed its purposes in enacting this legislation as follows:

"It is the intent of the Legislature to create and maintain an effective and comprehensive system of regulation and use of all timberlands so as to assure that:

"(a) Where feasible, the productivity of timberlands is restored, enhanced, and maintained.

"(b) The goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment."  (§ 4513.)

Section 4581 provides that "[n]o person shall conduct timber operations unless a timber harvesting plan prepared by a registered professional forester has been submitted for such operations to the department . . . ."  (Cf. *T.R.E.E.S.* v. *Dept. of Forestry & Fire Prot.* (1991) 233 Cal.App.3d 1175, 1180.)  A timber harvesting plan ("THP") must include, among other things, a description of the land on which the work is proposed to be done, special provisions, if any, to protect any unique area within the area of timber operations, and "[a]ny other information the board provides by regulation to meet its rules and the standards of this chapter."  (§ 4582.)

Section 4551 specifically authorizes the Board to adopt forest practice rules and regulations:

"The board shall adopt district forest practice rules and regulations for each district in accordance with the policies set forth in Article 1 (commencing with Section 4511) of this chapter . . . to assure the continuous growing and harvesting of commercial forest tree species and to protect the soil, air, fish, and wildlife, and water resources, including, but not limited to streams, lakes, and estuaries."

The Board's rules and regulations "shall apply to the conduct of timber operations and shall include . . . measures for . . . the preparation of timber harvesting plans. . . ."  (§ 4551.5.)  Section 4552 states:

"The rules and regulations adopted by the board shall be based upon a study of the factors that significantly affect the present and future condition of timberlands and shall be used as standards by persons preparing timber harvesting plans.  In those instances in which the board intends the director to exercise professional judgment in applying any rule, regulation, or provision of this chapter, the board shall include in its

rules standards to guide the actions of the director, and the director shall conform to such standards, consistent with Section 710."

Section 710 provides: "The director shall have no power to amend or repeal any order, regulation, ruling, or directive of the board." Finally, section 4582.75 states: "The rules adopted by the board shall be the only criteria employed by the director when reviewing timber harvesting plans . . . ."

The Board has adopted detailed rules and regulations implementing the Act. (Cal. Code Regs., tit. 14, §§ 895-1110.)[2] Rule 1034 provides for the inclusion within a THP of specified data, including: "Information on the presence and protection of known habitat or individuals of any listed species and information on the presence and protection of non-listed species which may be significantly impacted by the timber operation" (subd. (w)); "A general description of physical conditions at the plan site, vegetation and stand conditions, and watershed and stream conditions" (subd. (jj)); and "Any other information required by the rules or the Act to be included in the plan. The district rules provide for exceptions and alternatives to standard requirements that require inclusion of information in the THP" (subd. (gg)).

We believe that the submission of information concerning "known habitat or individuals of any listed species" and information concerning "non-listed species which may be significantly impacted" required under Rule 1034 does not reasonably include a comprehensive survey of *all* flora and fauna on the property. The former is designedly specific, while the latter is general and universal.

The rules pertaining to each of California's forest districts, i.e., the Coast Forest District (Rules 911-929.7), the Northern Forest District (Rules 931-949.7), and the Southern Forest District (Rules 951-969.7), contain a "cumulative impacts assessment checklist" (Rules 912.9, 932.9, 952.9, respectively) to each of which is appended a Technical Rule Addendum No. 2, listing the factors to be considered in evaluating "cumulative impacts." (See Appen. A.)[3]

We believe that while the information in cases which require a cumulative impacts assessment may be extensive, in no event is a comprehensive survey of all flora and fauna on the property required without regard to any perceived potential impact, such as "a substantial effect on [any known rare, threatened, or endangered species or species of special concern] or on the habitat of [such] species" or "a substantial reduction in required habitat [of any known wildlife or fisheries resource] . . . or substantial interference with the movement of resident or migratory species." (Appen. A, §§ 1, 2.) The assessment of cumulative impacts is guided by standards of practicality and reasonableness, and thus no particular mode of analysis is prescribed. (*East Bay Mun. Util. Dist.* v. *Dept. of Forestry & Fire Prot.* (1996) 43 Cal.App.4th 1113, 1127; *Laupheimer* v. *State of California* (1988) 200 Cal.App.3d 440, 465-466.)

---

[2] All rule references hereafter are to title 14 of the California Code of Regulations.

[3] A cumulative impacts assessment determines whether a proposed project, as presented, in combination with past, present, and reasonably foreseeable probable future projects has a reasonable potential to cause or add to significant cumulative impacts in watershed, soil, biological, recreational, or other resources. (See Rule 898.)

Rule 1037 directs the return, prior to filing, of a THP found by the Director to be inaccurate, incomplete, or otherwise not in proper order. Rule 1037.5, subdivision (g)(3) authorizes requests for additional information during the review period:

"Requests, if any, for additional information, from the plan submitter during the review period shall be as prescribed by Section 1034 and other conditions in the rules. Such requests shall be supported by reasons for the request.

"During the review period, the Director shall be responsible for determining whether requests for information not contained in the plan as filed or developed in preharvest inspection by review team members, reviewing agencies and members of the public, are consistent with the Forest Practice Rules, are reasonably necessary and should be requested from plan submitters. The Director's determination of additional information to be provided by plan submitters shall be guided by standards of practicality and reasonableness, recognizing the statutory review period of the FPA, the requirements of 14 CCR 1034 and the availability of information from alternative sources."

In our view, neither Rule 1037 nor Rule 1037.5, providing for the determination of additional information to "be guided by standards of practicality and reasonableness" and "supported by reasons for the request," authorizes the demand of a comprehensive survey of flora and fauna on the property to be harvested.

No other provisions of the Act or the Board's implementing rules require a comprehensive flora and fauna survey to be submitted by a property owner in order to receive a timber harvesting permit.

2.      The California Environmental Quality Act

We next consider the provisions of a different and distinct statutory scheme, the California Environmental Quality Act (§§ 21000-21178; "CEQA"). CEQA authorizes a public agency to require that applicants for use entitlements submit data and information necessary to enable the agency to determine whether the proposed project may have a significant effect on the environment. (§ 21160.) Hence, in approving a THP, the Department and Board must conform not only to the detailed and exhaustive provisions of the Act, but also to applicable provisions of CEQA from which they have not been specifically exempted by the Legislature. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1228.)[4] Accordingly, the Department is authorized to require the submission of

---

[4] Section 4514 provides:

"No provision of this chapter or any ruling, requirement, or policy of the board is a limitation on any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) On the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer."

information not expressly specified in its rules if the information requested is necessary to enable it to determine whether a THP will have a significant adverse impact on the environment. (*Id.*, at p. 1220.)[5]

Is a comprehensive flora and fauna survey, as a condition of approving a THP, authorized by CEQA? The answer is suggested in *Sierra Club* v. *State Bd. of Forestry*, *supra*, 7 Cal.4th at 1234:

> "We recognize that the Legislature cannot have intended the department to have unfettered discretion in the type of information that it may require. Section 21160 limits the agency's power to compel information to that `data and information which may be necessary to enable the public agency to determine whether the proposed project may have a significant effect on the environment. . . .' To comply with the requirements of this section, the information sought by the department must be information that will reveal effects of timber harvesting that can be fairly described as `significant.' Section 21068 defines `significant effect on the environment' as `a substantial, or potentially substantial, adverse change in the environment.'"

In our view, section 21160 does not authorize the Department, in determining whether a proposed plan would have a significant adverse impact on the environment, to require a comprehensive survey of all flora and fauna on the property, without regard to whether such information would reveal any such significant effect.

No other provision of CEQA authorizes the Department, Director, or Board to require a property owner to submit a comprehensive flora and fauna survey of his or her property.

It is concluded that as a condition for the issuance of a timber harvesting permit, the Department may not require a property owner to submit a comprehensive flora and fauna survey of the property.[6]

---

[5] The authority to require the submission of information not expressly specified in the Board's rules does not conflict with section 4582.75, providing that the rules adopted by the Board shall be the only criteria employed by the Director. As explained by the court in *Sierra Club* v. *State Bd. of Forestry*, *supra*, 7 Cal.4th at 1232-1233:

> ". . . [A] request for information is not a *criterion* for reviewing a timber harvesting plan, but is instead a prerequisite to application of the criteria established by the board, in particular, that rule requiring the director to disapprove those plans which do not incorporate procedures to substantially lessen significant adverse impacts on the environment. (Cal. Code Regs., tit. 14, § 898.1, subd. (c)(1).) The director of the department cannot discharge that obligation until the significant adverse impacts of the timber harvesting operation have been identified."

[6] As distinguished from a THP, a sustained yield plan ("SYP") is a comprehensive plan of timber harvesting management that addresses long-term silvicultural considerations for a large area. (Rules 1091.1-1091.14.) A SYP is a voluntary plan which "may be submitted at the option of the landowner and is intended to supplement the THP process by providing a means for addressing long-term issues of sustained timber production, and cumulative effects analysis which includes issues of fish and wildlife and watershed impacts on a large landscape basis." (Rule 1091.1.) Arguably, the information submitted in a SYP may be more extensive than that required in a THP. Nevertheless, Rule 1091.1 expressly provides that "It is the intent of this Article that the requirements for informational or analytical support for a SYP shall be guided by the principles of practicality and reasonableness; no information or analysis shall be required which in the light of all applicable factors is not feasible. However, it is the intent of this Article that all potential adverse economic impacts resulting from proposed

\* \* \* \* \*

harvesting be described, discussed and analyzed before such operations are allowed. . . ."  Rule 1091.7 similarly provides in part:  "The sufficiency of the information provided in a SYP to evaluate environmental effects shall be judged in the light of what is reasonably feasible and necessary."  In any event, we are not asked to nor do we consider the appropriate scope of a SYP.

6.                                                                                                                            95-902

**APPENDIX A**

Technical Rule Addendum No. 2, Paragraph C

Biological Resources

Biological assessment areas will vary with the species being evaluated and its habitat. Factors to consider in the evaluation of cumulative biological impacts include:

1.      Any known rare, threatened, or endangered species or species of special concern (as described in the Forest Practice Rules) that may be directly or indirectly affected by project activities.

Significant cumulative effects on listed species may be expected from the results of activities over time which combine to have a substantial effect on the species or on the habitat of the species.

2.      Any significant, known wildlife or fisheries resource concerns within the immediate project area and the biological assessment area (e.g. loss of oaks creating forage problems for a local deer herd, species requiring special elements, species of special concern, and significant natural areas).

Significant cumulative effects may be expected where there is a substantial reduction in required habitat or the project will result in substantial interference with the movement of resident or migratory species.

The significance of cumulative impacts on non-listed species viability should be determined relative to the benefits to other non-listed species.  For example, the manipulation of habitat results in conditions which discourage the presence of some species while encouraging the presence of others.

3.      The aquatic and near-water habitat conditions on the THP and immediate surrounding area.   Habitat conditions of major concern are:

o       Pools and riffles.

o       Large woody material in the stream.

o       Near-water vegetation.

Much of the information needed to evaluate these factors is described in the preceding Watershed Resources section.   A general discussion of their importance is given below:

a.      Pools and Riffles

Pools and riffles affect overall habitat quality and fish community structure. Streams with little structural complexity offer poor habitat for fish communities as a whole, even though the channel may be stable. Structural complexity is often lower in streams with low gradients, and filling of pools can reduce stream productivity.

b.     Large Woody Material

Large woody debris in the stream plays an important role in creating and maintaining habitat through the formation of pools. These pools comprise important feeding locations that provide maximum exposure to drifting food organisms in relatively quiet water. Removal of woody debris can reduce frequency and quality of pools.

c.     Near-Water Vegetation

Near-water vegetation provides many habitat benefits, including: shade, nutrients, vertical diversity, migration corridors, nesting, roosting, and escape. Recruitment of large woody material is also an important element in maintaining habitat quality.

4.     The biological habitat condition of the THP and immediate surrounding area. Significant factors to consider are:

o     Snags/den trees.

o     Downed, large woody debris.

o     Multistory canopy.

o     Road density.

o     Hardwood cover.

o     Late seral (mature) forest characteristics.

o     Late seral habitat continuity.

The following general guidelines may be used when evaluating biological habitat. The factors described are general and may not be appropriate for all situations. No actual measurement is intended. The THP preparer must also be alert to the need to consider factors which are not listed below. Each set of ground conditions are unique and the analysis conducted must reflect those conditions.

a.     Snags/Den/Nest Trees

Snags, den trees, nest trees and their recruitment are required elements in the overall habitat needs of more that 160 wildlife species. Many of these species play a vital role in maintaining

the overall health of timberlands.  Snags of greatest value are > 16" DBH and 20 feet in height.  The degree of snag recruitment over time should be considered.  Den trees are partially live trees with elements of decay which provide wildlife habitat.  Nest trees have importance to birds classified as a species of special concern.

   b.  Downed large, woody debris

   Large downed logs (particularly conifers) in the upland and near-water environment in all stages of decomposition provide an important habitat for many wildlife species.  Large woody debris of greatest value consists of downed logs > 16" diameter at the large end and > 20 feet in length.

   c.  Multistory canopy

   Upland multistoried canopies have a marked influence on the diversity and density of wildlife species utilizing the area.  More productive timberland is generally of greater value and timber site capability should be considered as a factor in an assessment.  The amount of upland multistoried canopy may be evaluated by estimating the percent of the stand composed of two or more tree layers on an average per acre basis.

   Near-water multistoried canopies in riparian zones that include conifer and hardwood tree species provide an important element of structural diversity to the habitat requirements of wildlife.  Near-water multistoried canopy may be evaluated by estimating the percentage of ground covered by one or more vegetative canopy strata, with more emphasis placed on shrub species along Class III and IV streams (14 CCR 916.5, 936.5, or 956.5).

   d.  Road density

   Frequently traveled permanent and secondary roads have a significant influence on wildlife use of otherwise suitable habitat.  Large declines in deer and bear use of areas adjacent to open roads are frequently noted.  Road density influence on large mammal habitat may be evaluated by estimating the miles of open permanent and temporary roads, on a per-section basis, that receive some level of maintenance and are open to the public.  This assessment should also account for the effects of vegetation screening and the relative importance of an area to wildlife on a seasonal basis (e.g. winter range).

   e.  Hardwood Cover

   Hardwoods provide an important element of habitat diversity in the coniferous forest and are utilized as a source of food and/or cover by a large proportion of the state's bird and mammal species.  Productivity of deer and other species has been directly related to mast crops.  Hardwood cover can be estimated using the basal area per acre provided by hardwoods of all species.

   f.  Late Seral (Mature) Forest Characteristics

Determination of the presence or absence of mature and over-mature forest stands and their structural characteristics provides a basis from which to begin an assessment of the influence of management on associated wildlife. These characteristics include large trees as part of a multilayered canopy and the presence of large numbers of snags and downed logs that contribute to an increased level of stand decadence. Late seral stage forest amount may be evaluated by estimating the percentage of the land base within the project and the biological assessment area occupied by areas conforming to the following definitions:

Forests not previously harvested should be at least 80 acres in size to maintain the effects of edge. This acreage is variable based on the degree of similarity in surrounding areas. The area should include a multi-layered canopy, two or more tree species with several large coniferous trees per acre (smaller subdominant trees may be either conifers or hardwoods), large conifer snags, and an abundance of large woody debris.

Previously harvested forests are in many possible stages of succession and may include remnant patches of late seral stage forest which generally conform to the definition of unharvested forests but do not meet the acreage criteria.

g.    Late Seral Habitat Continuity

Projects containing areas meeting the definitions for late seral stage characteristics must be evaluated for late seral habitat continuity. The fragmentation and resultant isolation of late seral habitat types is one of the most significant factors influencing the sustainability of wildlife populations not adapted to edge environments.

This fragmentation may be evaluated by estimating the amount of the on-site project and the biological assessment area occupied by late seral stands greater than 80 acres in size (considering the mitigating influence of adjacent and similar habitat, if applicable) and less than one mile apart or connected by a corridor of similar habitat.

h.    Special Habitat Elements

The loss of a key habitat element may have a profound effect on a species even though the habitat is otherwise suitable. Each species may have several key limiting factors to consider. For example, a special need for some large raptors is large decadent trees/snags with broken tops or other features. Deer may have habitat with adequate food and cover to support a healthy population size and composition but dependent on a few critical meadows suitable for fawning success. These and other key elements may need special protection.

4.                                                                                  95-902