[No. A051757. First Dist., Div. One. Mar. 27, 1992.]

ENVIRONMENTAL PROTECTION INFORMATION CENTER, INC., et al., Plaintiffs and Appellants, v.
MAXXAM CORPORATION et al., Defendants and Respondents;
PACIFIC LUMBER COMPANY et al., Real Parties in Interest and Respondents.

COUNSEL

Towner & Lippe and Thomas N. Lippe for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, R. H. Connett, Assistant Attorney General, M. Anne Jennings and Sarah C. Backus, Deputy Attorneys General, for Defendants and Respondents.

Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter and Frank Shaw Bacik for Real Parties in Interest and Respondents.

OPINION

NEWSOM, J.—The Environmental Protection Information Center, Inc. (EPIC), and Lynn Burchfield (hereafter appellants) appeal from an order dismissing on grounds of mootness their petition for writ of mandate to set aside the approval by the California Department of Foresty and Fire Protection (hereafter Department) of two timber harvest plans submitted by Pacific Lumber Company (hereafter Palco).

Though both affected relatively small stands of old-growth timber, the two timber harvest plans presented many contrasting features. Plan 1-87-625 HUM (hereafter plan 625) covered 641 acres of predominantly redwood forest in the Root Creek drainage in Humboldt County. Apart from certain small sections, the land had previously been selectively logged between 1959 and 1982 and supported a vigorous secondary growth. The plan called for clearcutting two areas of 37 and 38 acres and for removal elsewhere of seed trees left standing in the previous logging. The first of these areas had failed to develop satisfactory regrowth in earlier logging. The second area

contained 24 acres of forest recently logged in 1982 and a 14-acre "island" of old-growth redwood forest. These 14 acres were near a stand of mature residual forest and 1 mile from the nearest remaining area of old-growth timber and 2.5 miles from the Grizzly Creek Redwoods State Park. About 34 percent of the Root Creek drainage, comprising 4,500 acres, had been logged in the previous 10 years.

Plan 1-87-690 HUM (hereafter plan 690) concerned 54 acres of old-growth timber along Lawrence Creek in Humboldt County. Lying on steep slopes and bluffs ranging from 20 to 85 percent, the site adjoined 500-600 acres of old-growth forest on the opposite bank and along the stream to the northeast. The portion of the site adjacent to Lawrence Creek had a slope in excess of 70 percent. In the immediate drainage area, 78 percent of the land had been logged in the previous 10 years.

Plan 625 and plan 690 were filed, respectively, on October 15 and December 21, 1987. The interdisciplinary review team conducted a preharvest inspection of both sites; a Department geologist conducted a field study of soil stability; and an archeologist made a field inspection of plan 625. In response to a request for additional information, Palco vice-president John Campbell supplied a 15-page letter with a number of documents and studies as exhibits. In the course of the agency review, Palco agreed to several extensions of the 25-day review period provided by Public Resources Code section 4582.7. The record reveals close attention to the problems of aquatic wildlife species, soil conservation, and watershed protection. Palco produced stream surveys indicating that two threatened amphibian species, the tailed frog and the Olympic salamander, were not found in Root Creek or Lawrence Creek, and it agreed to several measures intended to mitigate the risk of erosion and landslides.

The California Department of Fish and Game (hereafter DFG), however, expressed concerns about the impact of the logging plans on bird and mammal species dependent on old-growth forest, specifically mentioning the spotted owl, marbled murrelet, osprey, northern goshawk, fisher and red tree vole. These concerns caused the DFG to file nonconcurrences to the interagency review team reports recommending approval of the plans; in the case of plan 625, the nonconcurrence applied only to the portion of the plan "that is proposed for clear-cutting." As an explanation for its nonconcurrence to each plan, the DFG cited the failure to "identify significant adverse cumulative impacts" affecting these wildlife species, the absence of any discussion of alternatives to clearcutting, and the lack of other assurances "that due consideration has been given to the old-growth dependent wildlife species."

In later correspondence with the Department, the DFG made several points relating to the internal ecological integrity of the sites and the broader biogeographical context. With regard to the internal ecological integrity, it noted the lack of any information regarding which species, and the number of individuals of each species, that "will be impacted" and called for wildlife surveys of the sites. "This information," it insisted, "will be necessary to identify the extent and nature of significant impacts, adverse or benign and to review the adequacy of proposed mitigation measures." Gary Stacey, environmental services supervisor, initially appeared to suggest that there were no feasible mitigation measures, short of allowing the timber to "remain unharvested." But Donald Lollock, chief of the environmental services division, clearly disavowed this position. He stated, "Some potential measures are retention of valuable wildlife structure such as large snags, trees with broken tops or other wildlife features and dead and down woody material, and protection of Key [sic] wildlife sections of forest, and dens. In addition, some habitat enhancement may be built into the plan . . . . A possible mitigation tool is pre/post harvest studies to determine the effectiveness of protection measures."

With regard to the biogeographical context, Lollock maintained that cumulative impacts could not be assessed "by reviewing THPs [timber harvest plans] on a one at a time basis"; it was necessary rather to consider the viability of entire wildlife communities within the state. In response to Palco's objection that plan 625 (unlike plan 690) contained only an isolated fragment of old-growth, he conceded, "We agree with the timber owner's letter of February 11, 1988 that a sufficient patch of 'old growth' habitat has not survived to exist as an important biogeographical island. However, the existing forest with smaller fragments of old growth may still serve as important wildlife nesting, corridor, and escape habitat and its loss should be mitigated to the extent possible." For his part, Stacey disagreed with the Department's suggestion that the existence of 76,000 acres of old-growth in public parks obviated the need to "consider the issue of logging old growth private holdings on its own merit."

In his letter of February 24, 1988, Palco vice-president John Campbell responded to the DFG's nonconcurrence by making three points, each supported by extensive exhibits: "First, the seven species of concern are not exclusively dependent on old growth forests; second, there is a significant portion of old growth forest currently managed by state and federal agencies in California; and third, these species have distributions that are beyond California state lines."

Appellants alleged both in their petition and a later application for preliminary injunction that the Department failed to consult with the DFG

regarding the Campbell letter while relying on it to justify approval of the plans. According to appellants, a deputy director of the Department, Ross Johnson, transmitted the Campbell letter, without any of its supporting exhibits, to the DFG timber harvest review coordinator, Jim Steele, on Friday, February 26, 1988. Steele received the exhibits the next Monday, February 29, 1988. Believing that this was the day set for decision on the plans, Donald Lollock, chief of the DFG Environmental Services Division, delivered a letter to Johnson the same day requesting a 10-day period to respond to data in the Campbell letter. On March 1, 1988, Johnson told Steele that the previous day, February 29, 1988, in fact represented the deadline for receiving comments on the plans. Steele expressed a need for a five-day extension of the deadline. The Department subsequently reached an understanding with Palco's chief forester, extending the review period until March 7, 1988, but it allegedly did not notify the DFG of the extension or respond to Lollock's letter. Environmental services coordinator Gary Stacey began work on a response to the Campbell letter but learned that the plans had been approved before he had completed his comments.

On February 29, 1988, Ross Johnson requested Palco to leave "snags and old down logs and trees" on the areas to be clearcut on the two sites "[a]s an extra mitigation measure, determined to be necessary by the Fish and Game Department." The record reveals nothing about the DFG's role, if any, in originating this request. Palco quickly agreed to the measure, and the Department approved the plans on March 7, 1988.

The Department's official responses to significant environmental points, issued with the notices of conformance pursuant to title 14, California Code of Regulations, section 1037.8, relied on the Campbell letter as a critical source of information on wildlife issues without responding directly to the precise ecological and biogeographical points raised in DFG correspondence. The two essentially identical responses erroneously attributed to the DFG a concern for two threatened amphibian species and discussed Palco's studies indicating that they were not found in the area. With regard to the bird and mammal species actually mentioned in DFG correspondence, the response acknowedges the absence of on-site surveys but relied on a computerized data bank as evidence that the species were not present.

Turning to the critical issue of cumulative impact, the response cites Campbell's argument that small fragmented stands of old-growth forest on private lands had little value to the birds and mammals dependent on old-growth which were known to use larger stands of old-growth forests "preserved in parks and national forests." The response for plan 625 concluded: "CDF [the Department] acknowledges that individual representatives

of old-growth dependent wildlife species present within the plan area may be displaced but judges the habitat protected on US Forest Service lands and public parks to be adequate to prevent adverse impacts to populations of old-growth dependent species. The small size, 14 acres, of the virgin old-growth stand in question has also been judged to be too small to provide critical habitat for maintenance of significant communities of any of the identified species of concern." The response for plan 690 added that the DFG disagreed with this view.

With regard to mitigation measures, the official responses referred to Gary Stacey's letter suggesting that no acceptable mitigation measures were possible but did not mention the statement of his supervisor, Donald Lollock, expressing a different view. The responses also mentioned Palco's agreement to retain snags and old downed logs.

After filing the petition for writ of mandate on March 18, 1988, in Humboldt County Superior Court, appellants applied for a temporary restraining order on April 1, 1988. On April 5, 1988, the trial court denied the application on the ground that the petition was not verified and the declaration in support of the temporary restraining order was based on hearsay. Upon appellants' motion for reconsideration, the court subsequently granted the temporary restraining order on April 25, 1988. The order interrupted logging that was already in progress on both sites. At the time it was granted, more than half of the timber within plan 690 had been felled. The 14 acres of old growth within plan 625, however, had apparently not been touched.

Appellants' subsequent motion for preliminary injunction raised important questions regarding the possible ecological importance of small stands of old-growth forest, and offered a series of expert opinions indicating that such small stands of forest may sometimes serve as nesting sites for certain old-growth dependent species or as stepping stones connecting remnant communities of these species. They prevailed, securing a preliminary injunction with respect to plan 690, which contained a stand of old-growth contiguous to larger stands along a stream corridor, but the court found that its showing was insufficient to justify an injunction for the smaller and more isolated patch of redwood within plan 625.

The preliminary injunction prohibiting logging operations within plan 690 presented Palco with a dilemma. Logging had been completed on only 20 acres; on another 21 acres, the trees had been felled and were lying on the ground. To remove this timber, Palco needed to fell an additional three-acre patch of timber so as to permit the use of a skyline yarder. The problem was

resolved in a settlement with appellants. In a stipulation to modify the preliminary injunction filed July 13, 1988, Palco consented to an injunction against logging the remaining 14-acre patch within plan 625, and appellants agreed that Palco could remove the downed timber and log the additional 3 acres within plan 690. The stipulation protected a remaining 10 acres of old-growth within plan 690, lying in part within the watercourse and lake protective zone where logging was independently restricted under title 14 California Code of Regulations, section 916.5.

On October 5, 1989, and May 2, 1990, Palco filed reports of completion of work described in plans 625 and 690, respectively, pursuant to Public Resources Code section 4585. Both reports certified that all work on the plans had been completed the previous month. Later in the year, the Department moved to dismiss the petition for writ of mandate on grounds of mootness. The motion was based both on completion of work under the plans and on various changes in regulatory law and policy since the plans were approved. The trial court granted the motion in a ruling entered on September 20, 1990.

■ Appellants concede that the court may no longer issue a writ of mandate. The writ lies to compel the performance of a legal duty imposed on a government official. (Code Civ. Proc., § 1085.) Since Palco could not log under the two challenged timber harvest plans after certifying completion of the work, the issue of requiring the Department to withdraw approval of the plans has become moot. (*Prune & A. G. Assn.* v. *Orchard Company* (1925) 195 Cal. 264 [232 P. 463]; *Wilson* v. *L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [246 P.2d 688]; *Coyne* v. *Superior Court* (1947) 80 Cal.App.2d 898, 901 [183 P.2d 36].) Appellants in effect achieved their objective of protecting the old growth timber from logging under the timber harvest plans when Palco filed the notices of completion.

■ Appellants claim instead a right to pursue declaratory or injunctive relief. We see no merit to the claim of right to declaratory relief. Although a petition for writ of mandate may sometimes be properly joined with a complaint for declaratory relief (*Californians for Native Salmon etc. Assn.* v. *Department of Forestry* (1990) 221 Cal.App.3d 1419 [271 Cal.Rptr. 270]; Cal. Administrative Mandamus (Cont.Ed.Bar 2d ed. 1989) § 1.12, p. 12), appellants here did not plead a cause of action for declaratory relief, and we decline to construe the petition for writ of mandate as alleging a right to such relief. A petition for writ of mandate and a complaint for declaratory relief state substantially different causes of action. (Code Civ. Proc., §§ 1060, 1085 and 1094.5; but see *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 546 [99 Cal.Rptr. 745, 492 P.2d 1137].)

■ The petition does plead a right to injunctive relief, but the prospective nature of this relief also precludes the adjudication of certain issues. Since injunctive relief serves to protect a plaintiff from threatened future invasions of legally protected interests (*Orloff* v. *Los Angeles Turf Club* (1947) 30 Cal.2d 110 [180 P.2d 321, 171 A.L.R. 913]), it cannot serve as a vehicle for adjudicating appellants' claims that portions of the Department's official response to significant environmental issues lacked support in the record, that the Department wrongfully failed to transmit the Campbell letter to EPIC, or that the Department failed to consider the alternatives of logging other parcels of timber before cutting these stands of old-growth.

Appellants argue, however, that there is a need for injunctive relief against violation of the Forest Practice Act in connection with future applications for logging the remaining old-growth timber on these sites. The formality of filing a report of work completion did not change the essential interests at stake in this litigation. Appellants' primary objective was to protect the ecological value of these two stands of old-growth forest by assuring that the Department considered the cumulative adverse impact on threatened bird and mammal species and feasible measures to mitigate this impact. The areas of forest at issue still remain at least partially intact. Palco has not abandoned plans to log these stands; appellants have produced evidence that it is engaged in a program of logging much, if not all, of its remaining old-growth holdings in the next 10-20 years.

Appellants contend that injunctive relief can offer much the same remedy as that sought in the petition for writ of mandate. By securing a writ of mandate withdrawing approval of the timber harvest plans, appellants sought to assure that cumulative impact and feasible mitigation measures regarding wildlife will be properly considered in the renewed application that Palco might be expected to submit. An appropriately drafted injunction could similarly assure that the Department would not approve a renewed application for a timber harvest plan without proper consideration of these matters.

Appellants' right to this injunctive relief presents a close question. The record here would clearly support a finding that the Department breached its obligation to consult with the DFG and failed to respond to the DFG's contentions regarding cumulative adverse impacts and mitigation measures affecting threatened bird and mammal species. An injunction may issue to prevent the threatened enforcement of a "statutory scheme" in an illegal manner where there is no adequate remedy at law. (Code Civ. Proc., § 526; *Coffee-Rich, Inc.* v. *Fielder* (1975) 48 Cal.App.3d 990, 1000 [122 Cal.Rptr. 302]; *Brownfield* v. *Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410 [256 Cal.Rptr. 240].)

We have taken judicial notice, however, of changing departmental policies regarding consultation with the DFG and review of environmental impact and mitigation measures affecting wildlife. In the past three years, the Department has demanded wildlife surveys in reviewing a number of timber harvest plans for old-growth forest. Furthermore, we note that the Department has promulgated regulations for protection of the marbled murrelet (Cal. Code Regs., tit. 14, §§ 895.1, 912, 919.13, 919.14), and northern spotted owl (Cal. Code Regs., tit. 14, § 919.6, subd. (d)(1), 919.9, 919.10) and has revised regulations on cumulative impact that may satisfy some of appellants' objections on this issue. It must be presumed that the Department will obey and follow the law. (Cf. *Lezama* v. *Justice Court* (1987) 190 Cal.App.3d 15, 21 [235 Cal.Rptr. 238].) In light of these significant changes in departmental policies and regulations, we see no basis for issuing an injunction against threatened enforcement of a "statutory scheme" in an illegal manner. If the policies and regulations still retain objectionable features, theyshould be challenged in actions addressing current enforcement of existing regulations.

The record, including the documents of which we have taken judicial notice, leaves no doubt that environmental litigation, such as appellants' preliminary injunction in this case, played an important role in bringing about changes in departmental policies. To this extent, the issue of mootness is a product of appellants' own success. But this consideration still does not affect the availability of injunctive relief.

The judgment is affirmed.

Strankman, P. J., and Dossee, J., concurred.