[No. A064890. First Dist., Div. Four. Feb. 28, 1996.]

EAST BAY MUNICIPAL UTILITY DISTRICT, Plaintiff and Appellant,
v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION, Defendant
and Respondent;
GEORGIA PACIFIC CORPORATION, Intervener and Respondent.

**COUNSEL**

Thomas N. Lippe, Alice G. Vilardi and Fred S. Etheridge for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Acting Assistant Attorney General, and M. Anne Jennings, Deputy Attorney General, for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Joseph A. Darrell and M. Elizabeth McDaniel for Intervener and Respondent.

**OPINION**

**ANDERSON, P. J.**—In this case we examine what evidence may be considered in a declaratory relief action which seeks to challenge the legality

under the California Environmental Quality Act (CEQA) of a policy or practice employed by an administrative agency. The case, which arises from timber harvest plans approved under the Z'berg-Negedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.), is an appeal by plaintiff, East Bay Municipal Utility District (EBMUD), from a judgment entered in a coordinated proceeding joining the utility's petition for a writ of mandamus with this action for declaratory relief both brought against defendant, California Department of Forestry and Fire Protection (CDF). Plaintiff sought by its mandamus action to challenge CDF's approval of a particular timber harvest plan and by its declaratory relief action to establish that CDF was following a pattern and practice of improperly approving other timber harvest plans (THP's), all of which had been submitted to CDF by intervener, Georgia Pacific Corporation (Georgia Pacific).

In *Californians for Native Salmon etc. Assn.* v. *Department of Forestry* (1990) 221 Cal.App.3d 1419 [271 Cal.Rptr. 270] Division Five of this court held that an action challenging an administrative agency policy of ignoring or violating applicable laws and regulations, but not challenging any specific agency decision, was an actual, justiciable controversy for which declaratory relief was available. (*Id.* at pp. 1426-1430.) In fact no trial ever took place in *Native Salmon,* which arose on a demurrer, because the challenged practices were modified by the adoption of new regulations. (*Id.* at p. 1424.) The present action represents the first declaratory relief action of the type sanctioned by *Native Salmon* to go to trial.

EBMUD, which provides water to Alameda and Contra Costa Counties, has two reservoirs, Camanche and Pardee, located downstream from timberland, a considerable portion of which is owned and logged by Georgia Pacific. EBMUD's operation of Camanche Reservoir is conditioned upon its subsidizing a fish hatchery just downstream. In 1987 and again in each of the following two years the waters of Camanche developed amounts of hydrogen sulfide which resulted in fish kills at the hatchery. EBMUD was told by its expert that the hydrogen sulfide in Camanche was a result of increased nutrients carried into the reservoir waters by sediments which often result from upstream logging.

Georgia Pacific's logging operations in the watershed, like all such operations in the state, are subject to approval by CDF of a site-specific harvest plan (the THP) submitted to the agency. (Pub. Resources Code, §§ 4581, 4582.5; see *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1226-1227 [32 Cal.Rptr.2d 19, 876 P.2d 505].) In its complaint for declaratory relief EBMUD alleged that CDF had a pattern and practice of improperly assessing the cumulative impacts of logging and was as a consequence

improperly issuing timber harvest permits in the Mokelumne River watershed. The utility alleged that improper logging practices posed a risk to downstream fisheries and to its drinking water supplies. The second cause of action in EBMUD's complaint alleged that recently adopted cumulative impact assessment regulations governing THP's were void because they were inconsistent with CEQA.

The day before EBMUD filed its action for declaratory relief it petitioned for a writ of mandamus after CDF approved Georgia Pacific's THP—plan 81—for the Forest Creek watershed. The writ action was tried in August 1992, and in November the court issued its proposed statement of decision and a writ of mandamus[1] on a finding that CDF had abused its discretion by approving plan 81. The court found that CDF had failed to properly assess cumulative impacts by not requiring Georgia Pacific to provide sufficient information about reasonably foreseeable future projects, by failing to take account of activities beyond the assessment area which public comments had indicated would affect the cumulative impact, and by failing to follow one of its rules. CDF did not appeal from the writ.[2]

Subsequently, in February 1993 the first cause of action in the declaratory relief suit was tried. The second cause of action was then resolved by summary adjudication which found that the cumulative impact rules were consistent with CEQA. As to the first cause of action the court concluded that CDF had impermissibly used guidelines for watershed assessment areas which had not been formally adopted under the Administrative Procedures Act (Gov. Code, § 11500 et seq.), and it directed the agency to comply with the act but declined to enjoin CDF's use of the guidelines in the interim. The court then concluded that despite the improper use of the guidelines the agency's cumulative impacts analysis was legally adequate. Finally, the court found that EBMUD had "not met its burden of proving an overarching pattern and practice of unlawful conduct" in CDF's assessment of cumulative impacts.

I. DISCUSSION

A. *Declaratory Relief for Pattern and Practice Claims*

On appeal EBMUD raises many claims of error. Several of them relate to the pattern and practice claim which constituted its first cause of

---

[1] The writ was one for traditional mandamus (Code Civ. Proc., § 1085).

[2] An appeal was taken by CDF and Georgia Pacific from the costs award made in the mandamus action. That companion appeal is *East Bay Mun. Utility Dist.* v. *Department of Forestry & Fire Protection* ((Feb. 28, 1996) A068567 [nonpub. opn.]).

action for declaratory relief. In order to prove its claim that CDF followed a policy of "ignoring or violating applicable laws and regulations" EBMUD offered as evidence 39 THP's submitted in 1991 and 1992 by Georgia Pacific and approved by CDF for the Mokelumne River watershed. EBMUD contends that the trial court erred in going outside the four corners of these thirty-nine THP administrative records and allowing testimony and documentary evidence as to the manner in which CDF conducted its cumulative impact assessment. EBMUD argues that instead of taking additional evidence the trial court was obliged to look only at each of the 39 THP's.

On appeal EBMUD maintains that the appropriate standard of review in this court is the same as it would be on appeal from a writ of administrative mandamus. First, "the Court of Appeal must determine whether CDF abused its discretion in approving each THP"—in short, that this court must also review each of the 39 approved THP's. Then EBMUD would have this court apply a substantial evidence standard of review to whether there were sufficient instances of erroneous approvals to establish a pattern and practice of abuse of discretion by CDF.

We set out EBMUD's contentions at some length because we do not accept them, and because they reveal a fundamental misperception of the nature of a pattern and practice claim for declaratory relief.

Declaratory relief is an equitable remedy which is available to an interested person in a case "of actual controversy relating to the legal rights and duties of the respective parties . . . ." (Code Civ. Proc.,[3] § 1060; *Dills v. Delira Corp.* (1956) 145 Cal.App.2d 124, 129 [302 P.2d 397].) Because it is a cumulative remedy (§ 1062) it is often sought, as it was here, in conjunction with requests for injunctive relief or mandamus.[4] Usually a specific adjudicatory decision or order of an administrative agency is reviewed by a petition for a writ of administrative mandamus (§ 1094.5). (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 249 [115 Cal.Rptr. 497, 524 P.2d 1281]; *City of Santee* v. *Superior Court* (1991) 228 Cal.App.3d 713, 718 [279 Cal.Rptr. 22].) The focus in an action for administrative mandamus is upon the application of a regulatory scheme to a specific set of facts. (See *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 676 [170 Cal.Rptr. 484, 620 P.2d 1032].) ▪ Thus, approval or disapproval

---

[3]Unless otherwise noted all subsequent statutory references are to the Code of Civil Procedure.

[4]EBMUD's complaint for declaratory relief also asked for an injunction to prevent CDF "from approving any timber harvest plans in the Mokelumne River watershed until [it] demonstrate[d] compliance with California law in assessing potential cumulative impacts of logging on the Mokelumne River and its tributaries."

by CDF of specific THP's is normally challenged by way of a petition for administrative mandamus. Indeed EBMUD challenged the approval of Georgia Pacific's plan 81 by a petition for mandamus.[5]

In its declaratory relief action EBMUD introduced the 39 approved THP's as evidence of what it alleged was CDF's consistent failure "to lawfully assess potential adverse cumulative impacts to water quality . . . ." EBMUD had not tried to invalidate by timely petitions for mandamus any of these 39 THP's as they were approved. Nonetheless, it sought not only to use the 39 approved plans as evidence of what it maintained was an improper pattern and practice, but also to limit the scope of the evidence considered in its declaratory relief action to the face of the 39 approved plans.[6]

We need express no opinion as to whether it might not be possible to prove a pattern and practice claim by virtue of such aggregate consideration of past agency decisions. Even if, however, the point to be made by the introduction of multiple past agency decisions is not that they individually or collectively should be reversed, presenting them in the aggregate as evidence of an improper policy or practice and labeling the action one for declaratory relief does not import into the declaratory relief action the rule applied in administrative mandamus which limits judicial review to the record before the administrative agency.

The reason for this is twofold. First, an action for declaratory relief is proper only when there is an actual, *present* controversy. (*Wilson* v. *Transit Authority* (1962) 199 Cal.App.2d 716, 724 [19 Cal.Rptr. 59].) While past agency decisions may be probative of current agency practice, they also may not be. The agency at least should be allowed to present evidence of what it is currently doing. Second, the very rationale for limiting the administrative

[5]The question of whether that petition was properly one for administrative (§ 1094.5) or traditional (§ 1085) mandamus was resolved by the court in favor of traditional mandamus on the basis that the public comment provisions of the administrative regulations did not amount to "an evidence-gathering, adjudicative process" which would compel review under section 1094.5.

The remedy available remains the same, whether the writ is properly one of administrative or traditional mandamus. (*Woods* v. *Superior Court, supra,* 28 Cal.3d at pp. 673-674.) Procedurally, however, appellate review of an action in administrative mandamus, because a factfinding hearing has already been held at the administrative level, will not normally permit the introduction of evidence beyond that presented in the administrative record. (*Toyota of Visalia, Inc.* v. *New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 881 [233 Cal.Rptr. 708]; § 1094.5, subd. (e).)

[6]Although documents relating to each of the 39 approved plans were entered into evidence CDF disputed that these documents constituted the "administrative record" for each THP. The trial court admitted them into evidence for the purpose of showing the informational context of and the procedures followed by CDF's review of the submitted plans.

mandamus record on review to that which was before the agency is lacking. One purpose of limiting judicial review of adjudicative agency decisions is judicial economy. (*Woods* v. *Superior Court, supra,* 28 Cal.3d at p. 680.) Thus in an administrative mandamus action which challenges a THP approval for chopping down all the trees on Blackacre, the approval will be supported or not by the record before the agency. However, it is very possible that the practice or policy the agency follows to select mitigation measures or to weigh cumulative impacts for THP's which permit chopping down all the trees from Arcadia to Zuma may or may not be revealed in, or explicitly described by, the administrative records for all the approved THP's from Arcadia to Zuma. Thus, the 39 THP's may be circumstantial evidence of pattern and practice, but they were not the *only* evidence relevant to the inquiry before the court in its declaratory relief inquiry.

EBMUD contends that all evidence outside the THP records was inappropriately considered by the trial court in that it amounted to what EBMUD characterizes as post hoc rationalizations for agency action.[7] The authority prohibiting such after the fact justification for agency decisions generally arises when it is only after an environmental impact report (EIR) has been approved that some missing, but essential, findings are made. (E.g., *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 81 [118 Cal.Rptr. 34, 529 P.2d 66].) It can also arise where a project has begun without adequate CEQA compliance. In such cases the fact that a challenged project is already underway or in existence does not permit the submitter of an EIR to consider less than the full range of alternatives available had the environmental assessment been conducted before any action was undertaken. (E.g., *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 425 [253 Cal.Rptr. 426, 764 P.2d 278].) Had EBMUD been challenging the approval of each of the 39 THP's, presumably by a series of petitions for mandamus, the question of post hoc rationalizations might have been germane.

However, EBMUD was seeking a declaration that *present* CDF practices in analyzing cumulative watershed impacts on the Mokelumne River watershed were violative of CEQA and should be enjoined. This was not a challenge to one agency decision which had been made, either lawfully or unlawfully, but to an on-going policy or manner of making decisions. Moreover, had the challenged policy or practice been set out in a single

---

[7]EBMUD points specifically to this language in the statement of decision: "Therefore the Court finds relevant and does consider evidence beyond the public records in deciding whether CDF consistently and as a matter of policy abused its discretion in analyzing and mitigating the potential cumulative impacts of Georgia-Pacific's harvesting."

document the task of the trial court would have been very different. For example, in *Bess* v. *Park* (1955) 132 Cal.App.2d 49, 53 [281 P.2d 556] despite a specific statutory mandate that disputes overpayment of employment agency fees be resolved initially by the Labor Commissioner, the commissioner refused to perform that duty until 90 days had elapsed; his 90-day policy was expressly set out in a letter. As the *Bess* court noted there was no factual controversy over what the policy at issue was. (*Id.* at p. 51.)

Here, in contrast, EBMUD sought to build a case with direct and circumstantial evidence drawn from many of the 39 approved THP's to show CDF had a series of practices which inadequately complied with CEQA. Thus, before the court ever got to the issue of lawfulness it, unlike the court in *Bess*, had to determine what was the present practice or policy of the agency. It was therefore appropriate that the trial court took evidence beyond that contained in the THPs themselves on how CDF analyzed impacts to the Mokelumne River watershed, including how the agency's practices and policies as of the time of trial had changed from those it had earlier employed.

The trial court did not err in expanding the scope of the evidence it considered beyond the face of the 39 THP's.[8] Nor did it err in declining to decide whether CDF had abused its discretion by approving each of the 39 THP's, and on appeal we likewise do not reach that question.

### B. *Watershed Assessment Guideline*

Among the regulations governing THP's is a checklist for assessment of cumulative impacts. (Cal. Code Regs., tit. 14,[9] § 912.9) Appended to that regulation is Technical Rule Addendum No. 2 which states that "[i]n evaluating cumulative impacts, the R[egistered] P[rofessional] F[orester] shall consider the factors set forth herein. . . ." (Tit. 14, § 912.9.) The addendum then goes on for several pages describing factors relevant to watershed resources, soil productivity, biological resources and recreational resources. (*Ibid.*)

At trial an even more lengthy CDF document was introduced entitled "Guidelines for Assessment of Cumulative Impacts" (Guidelines). It was undisputed that the Guidelines had not been adopted under the Administrative Procedures Act as Board of Forestry regulations. The trial court

---

[8] EBMUD in effect concedes that if evidence beyond the 39 THP's was properly considered there is substantial evidence to support the trial court's finding of no pattern and practice. Accordingly we do not reach its lack of substantial evidence claim.

[9] All further regulatory references are to the California Code of Regulations.

concluded that the portion of the Guidelines dealing with the definition of the size of the watershed assessment area was an illegal underground regulation because that portion of the Guidelines contained "standards of general application" by which CDF implemented its statutory authority rather than a way of managing its internal affairs. (*Grier* v. *Kizer* (1990) 219 Cal.App.3d 422, 428 [268 Cal.Rptr. 244].) The court noted that the watershed assessment portion of the Guidelines had been relied upon by the agency in evaluating many of the THP's in evidence, and that CDF then relied on the Guidelines at trial as authority for the fact that it had properly determined the size of the watershed assessment areas.

However, the court declined to enjoin CDF's use of the Guidelines or to enjoin it from approving further THP's by using the Guidelines. It concluded that, despite the application of the Guidelines to the THP's before it, use of the Guidelines "did not materially affect CDF's analysis of cumulative impacts or render it legally inadequate" because in fact CDF had considered impacts outside the watershed assessment area as defined under the Guidelines.

On appeal EBMUD contends that the trial court should have enjoined CDF from using its watershed assessment area guideline. It further contends that we should abandon the abuse of discretion standard of review normally applied to a trial court's decision with respect to granting injunctive relief, in favor of de novo review.

EBMUD argues that there are no factual issues here because the trial court found the watershed assessment portion of the Guidelines to be illegal regulations, hence the issue is purely one of law. We disagree. The trial court reached its conclusion that the watershed assessment section of the Guidelines were standards of general application because CDF had used the challenged portion of the Guidelines in that way in testimonial and documentary evidence presented at trial. Therefore, the determination reached by the trial court was not a pure issue of law or statutory interpretation. We review the denial of injunctive relief under the abuse of discretion standard. (*American Builder's Assn.* v. *Au-Yang* (1990) 226 Cal.App.3d 170, 175-176 [276 Cal.Rptr. 262].)

After the trial court indicated by its tentative decision that it found the Guidelines to be illegal underground regulations, CDF's director sent a mailing directed to all registered professional foresters and licensed timber

operators which informed them that the Guidelines "will not be used as the criteria for judging whether assessment areas are correct in the THP. . . ."[10]

■ An injunction properly issues only where the right to be protected is clear, injury is impending and so immediately likely as only to be avoided by issuance of the injunction. (*City of Tiburon* v. *Northwestern Pac. R.R. Co.* (1970) 4 Cal.App.3d 160, 179 [84 Cal.Rptr. 469].) A corollary of this rule is that a change in circumstances which renders injunctive relief unnecessary justifies denial of the remedy. (*Donald* v. *Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 184 [266 Cal.Rptr. 804].) An injunction should not issue as a remedy for past acts which are not likely to recur. (*Ibid.*)

■ In this instance CDF had publicly announced that it would no longer use the Guidelines to evaluate the adequacy of watershed assessment areas as defined in THP's submitted to it. There was absolutely no showing made to the trial court that in the past CDF had been duplicitous, nor any evidence to suggest that for some other reason CDF would begin to measure the adequacy of watershed assessment areas solely against the Guideline standards. In these circumstances we cannot say it was an abuse of discretion for the trial court to refuse to enjoin future application of watershed assessment area guidelines which the agency had expressly disavowed.

### C.  *Cumulative Impact Assessment*

EBMUD contends that the trial court erred in finding that it had failed to prove by a preponderance of the evidence that CDF's pattern and practice of assessing cumulative impacts was legally inadequate. EBMUD challenged three aspects of CDF's cumulative impacts analysis: watershed size, measurement of the significance of cumulative impacts and consideration of all closely related past, present and future projects.

Since many of EBMUD's contentions arise from its invocation of CEQA precedent it is important to summarize the relationship between the Z'berg-Negedly Forest Practice Act of 1973 and CEQA.  ■  While CEQA is the

---

[10]The notice went on to provide: "Rather, this decision [whether assessment areas are correct in the THP] will be made based on site-specific conditions for the watershed and other resource areas. Where there is a body of water such as a reservoir or estuary or similar feature where downstream effects may accumulate, the potential for cumulative effects in this area must be considered. If the assessment area may be enlarged to include this feature without becoming unwieldy, it should be enlarged. Impacts on this feature should be considered even if it is outside the assessment area(s) identified by the RPF."

On appeal EBMUD objects to this restated criteria contending that it will permit "unbridled license" to define the watershed area too narrowly. We express no opinion as to the sufficiency, either substantively or procedurally, of the assessment criteria as outlined in the letter.

general environmental statutory scheme in this state an exception to certain provisions of CEQA—notably its requirements for EIR's for projects at the state and local level and their review—has been created for regulatory programs of state entities which require submission of plans containing environmental information. (Pub. Resources Code, § 21080.5, subd. (a); *Sierra Club* v. *State Bd. of Forestry, supra,* 7 Cal.4th at p. 1231.) The timber harvest review process used by CDF to assess logging operations on private land has been certified as such a program. (7 Cal.4th at p. 1230.)

Regulations governing THP's require that the plan submitted include consideration of the cumulative impacts of the plan upon the environment. (Tit. 14, §§ 898, 912.9.) The regulations also require CDF to supplement as needed the cumulative impacts information supplied to ensure that "all relevant information is considered." (Tit. 14, § 898.) The registered professional forester (RPF) who prepares the THP on behalf of the logging company is directed to consider both on- and off-site interactions of the plan "with the impacts of past and reasonably foreseeable future projects." (Tit. 14, § 912.9, Tech. Rule Addendum No. 2.)

The most specific rules governing analysis of cumulative watershed impacts are those contained in regulations which took effect in 1991. (Tit. 14, § 912.9.) Title 14, section 912.9 sets out criteria imposed for cumulative impact assessment paralleling the criteria developed for EIR's in CEQA cases. Under the new regulations THP's must include information not only about the pending project but about past, present and reasonably foreseeable future projects. (Tit. 14, §§ 898, 912.9; see *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 72-77 [198 Cal.Rptr. 634].) However, in THP's, just as in EIR's prepared under CEQA, assessment of cumulative impacts are guided by standards of practicality and reasonableness; there is no one prescribed mode of analysis. (Tit. 14, §§ 898, 15130, subd. (b)(3); *Laupheimer* v. *State of California* (1988) 200 Cal.App.3d 440, 465-466 [246 Cal.Rptr. 82].)

### (1)   *Watershed Size*

■   EBMUD contends that there is insufficient evidence to support the trial court's finding that CDF's consideration of, and mitigation of, cumulative impacts was legally sufficient. Specifically EBMUD argues that CDF was improperly defining the size of the watershed assessment area, arbitrarily applying its own Guidelines for such a determination and using a ratio (area of the plan compared to area of the total Mokelumne River drainage) method to artificially understate impacts.

EBMUD points to inconsistencies in the testimony of CDF personnel about the categories of watercourses used to define the size of the watershed area and argues that because the testimony does not reflect any invariable scheme for making determinations it is therefore arbitrary. While that is a possible view of the evidence there was also considerable testimony before the court that CDF was attempting to use a watershed assessment area which was small enough to detect impacts, but not so small as to reduce any impact to insignificance. Although the plans routinely set out in a ratio the size of the area within the plan compared to the entire Mokelumne River watershed, that ratio gave only one measure of potential impacts. Moreover, there was testimony that CDF did not limit its cumulative impact study to the watershed assessment area as described by the plan, but also looked at activities and conditions upstream and downstream of the proposed plan and at watershed impacts from activities and projects predating or unrelated to Georgia Pacific's operations. Neither CEQA case law nor the agency's own rules require it to adopt and apply an invariable rule or procedure for determining the size of a watershed assessment area.

EBMUD urges this court to find that the Guidelines (whose use the trial court declined to enjoin) unreasonably restrict CDF's consideration of past and future projects. Specifically EBMUD objects to a checklist contained in the Guidelines. We decline to reach this question because despite how the checklist might be used to reach the result deplored by EBMUD, there was undisputed testimony at trial that it was not used in that manner, and because CDF has now disavowed use of the Guidelines.

### (2) Cumulative Impact Measurement

Often the adverse environmental impacts of a project can be lessened by adopting certain logging practices or undertaking corrective work. These efforts—because they serve to mitigate the severity of the environmental impacts—are termed mitigation measures. The rules governing THP's provide that "If the Director . . . finds that a plan cannot be approved [as submitted] . . . , the Director shall, . . . communicate with the preparer of the plan, explain any probable causes for disapproval and suggest possible mitigation measures. The preparer of the plan shall then have the opportunity to . . . provide appropriate mitigation measures prior to the end of the public comment period." (Tit. 14, § 898.1, subd. (d).)

EBMUD contends that CDF fails "to identify and disclose the cumulative impacts of each plan independent of its duty to mitigate the impacts of a plan." This practice, it argues, inverts the appropriate sequence of first

identifying the impacts and then suggesting mitigation. (*Sierra Club* v. *State Bd. of Forestry*, *supra*, 7 Cal.4th at p. 1233.)

In fact, EBMUD seems primarily to be troubled that CDF lacks quantitative data on whether and to what extent its mitigation measures reduce sedimentation. There was testimony at trial that CDF had decided that the quantification of sediment is an "inexact science at best" so the agency had focused its efforts instead upon prescribing mitigation efforts tailored to respond to the particular project and remedial efforts to reduce sedimentation from "bleeding sores, old problems from past projects . . . ."

EBMUD goes on to argue that absent such quantitative data "[a]t best, it can be assumed that the mitigations will lessen the sedimentation to some unknown extent." True, but all the mitigation needs to do is to substantially lessen significant adverse impacts. (Tit. 14, §§ 898, 898.1, subd. (c)(1).) Given the training and experience of CDF employees, many of whom are intimately familiar with the land in question, this, albeit imprecise, evaluation is one which can be made even without sedimentation surveys and studies.

This case is not analogous to *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1023 [192 Cal.Rptr. 325] where an EIR concluded that certain significant impacts would be "partially mitigated." Such a finding failed to reach the required conclusion as to whether the significant impact had been either altogether avoided by mitigation or substantially lessened. (*Ibid.*) There is no dispute that in the plans at issue here CDF found after mitigations were imposed that there would be no significant adverse impacts.[11]

There was ample evidence that in the process of preparing a plan which satisfied the foresters at CDF very specific mitigation measures in addition to those offered by the submitter were suggested by the agency, by other agencies and by EBMUD and were considered and often imposed by CDF.

While EBMUD would prefer that CDF use a different way of assessing the significance of cumulative impacts, it has failed to demonstrate the legal inadequacy of how CDF goes about determining that mitigation measures reduce the significance of such impacts.

---

[11]Typical is this language in the official response to the Swamp Cable THP: "*Along With the Framework Provided by the Forest Practice Act and the Rule of the Board of Forestry, and the Addition of the Mitigation Measures Specific to This THP, the Department Has Determined That There Will Be No Significant Adverse Impacts Resulting From the Implementation of This THP.*" (Italics in original.)

### (3) *Disclosure of Related Projects*

Finally, EBMUD contends that CDF has failed adequately to disclose, describe and consider all closely related past, present and reasonably foreseeable future projects which in combination with the THP under review could combine to have a significant adverse impact. In support of its contention EBMUD cites to the fact that Georgia Pacific was not required to disclose either all of the past plans throughout the Mokelumne River watershed, or other plans which the company intended to submit for the present calendar year, or the plans it had on the drawing board for the next several years. Nor was Georgia Pacific consistently required to include acreage which had been logged under an emergency notice procedure which allows harvesting without a THP of diseased or damaged trees. (Tit. 14, § 895.1.)

There was evidence at trial that Georgia Pacific prepared both five-year harvest plans and annual harvest plans, neither of which were submitted to CDF. Likewise, there was evidence that CDF did require Georgia Pacific to list all THP's within the past 10 years for the watershed assessment area defined in a given THP. Moreover, CDF maintained a copy of all THP's submitted on the Mokelumne River watershed since 1982. Beginning in 1989 when it became concerned that Georgia Pacific was planning to step up harvesting in the Mokelumne River watershed it created a map on which it plotted THP's. It also created a separate computer data base for Georgia Pacific plans. As of the time of trial Georgia Pacific had begun disclosing emergency notice harvests in its THP's.

Disclosure of past and future projects is required under the rules which provide the plan submitter to "[i]dentify and briefly describe the location of past and reasonably foreseeable future projects . . . within described resource assessment areas" and to "[i]dentify and give the location of any known, continuing significant environmental problems caused by past projects . . . ." (Tit. 14, § 912.9, Tech. Addendum No. 2.) This regulation requires the submission of information about projects within the watershed assessment area, but not a list of all past and future projects within the entire 370,000-acre Mokelumne River watershed.

EBMUD in essence attacks the sufficiency of so limiting the geographical boundaries within which disclosure is required. We are not prepared to say that CDF's use of the resource area as a basis for disclosure is legally insufficient. There was clearly evidence that CDF considered cumulative impacts of past and future projects adjacent to the watershed assessment area.

Admittedly CDF had not received full disclosure from Georgia Pacific of all its plans for future harvesting. However, the evidence was undisputed that beginning in 1989 CDF believed that within the following five years the company was planning to log all of its lands in the Mokelumne River watershed, and CDF analyzed impacts and imposed mitigations based upon that worse case scenario. By the time of trial CDF was requiring Georgia Pacific to submit more information regarding harvests it planned within five years. This information, coupled with that in the THP and in CDF's file of prior THP's which were available for public inspection, permit the inference that the public disclosure goals of CEQA were being met. (Pub. Resources Code, § 21080.5, subd. (d)(3); *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376, 392.)

In sum, we find that there was substantial evidence to support the trial court's findings that as of the time of trial whatever defects there may have been in CDF's methods, those defects were not so great as to render its current mode of assessing cumulative impacts legally infirm.

### D.  *Denial of Declaratory or Injunctive Relief*

█ EBMUD maintains that the trial court erred when it declined to issue a declaratory judgment or grant injunctive relief to force CDF to require disclosure of future plans and of emergency harvest notices. At the conclusion of the writ action on plan 81 the court issued a proposed statement of decision to the effect that: "Georgia Pacific's failure to provide at least the public information regarding reasonably foreseeable probable future projects and CDF's failure to gather the information itself, supports the conclusion that CDF failed to proceed in the manner required by law. . . ." Several months later, by the time this declaratory relief action was tried, CDF had changed its requirements. Accordingly at the conclusion of trial in the action for declaratory relief the court noted that it had imposed "certain informational requirements in its Plan 81 decision." It then went on to state, "In light of the Court's conclusion that CDF has changed its policies, and the absence of evidence that CDF will continue to commit this error after it has been pointed out, the Court sees no basis for issuing an injunction. . . ." EBMUD argues that the court abused its discretion by refusing to exercise its equitable powers to require the agency to continue these new policies.

As we discussed in part I.A. above the function of an action for declaratory relief is to resolve an ongoing controversy. (*Newland* v. *Kizer* (1989) 209 Cal.App.3d 647, 657-658 [257 Cal.Rptr. 450].) Moreover, plaintiff was faced with the additional burden of demonstrating a practice of unlawful

conduct by CDF. Thus, the trial court could reasonably conclude that once CDF had changed its policy, there was no longer an ongoing controversy because the challenged practice had been abandoned.

EBMUD's reliance on *Cook* v. *Craig* (1976) 55 Cal.App.3d 773, 780 [127 Cal.Rptr. 712] is misplaced. In that case the California Highway Patrol responded to a request for disclosure of citizen complaints both by opposing disclosure in the pending legal action and by asserting that it was not legally obliged to provide the documents. (*Ibid.*) Given the agency's stance the appellate court could reasonably conclude that the issue was likely to recur, despite the agency's voluntary disclosure in the pending legal action. CDF, in contrast, has not adopted the position that it can continue to forgo obtaining information on emergency and future harvests or that it can continue to use Guidelines which have not been approved under the Administrative Procedures Act.

While injunctive relief is available when it is likely that unlawful conduct will recur (*Phipps* v. *Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1118-1119 [251 Cal.Rptr. 720]), we must presume that the agency will obey and follow the law (*State Bd. of Education* v. *Honig* (1993) 13 Cal.App.4th 720, 748-749 [16 Cal.Rptr.2d 727]; *Environmental Protection Information Center, Inc.* v. *Maxxam Corp.* (1992) 4 Cal.App.4th 1373, 1382 [6 Cal.Rptr.2d 665]). This is not a case in which the agency has adopted the position that it has no obligation to require disclosure of future harvest plans but has required that information from Georgia Pacific only under the pressure of this litigation.

The trial court did not abuse its discretion by declining to exercise its equitable powers to direct policy changes which CDF had already implemented.

E.   *Facial Challenge to Title 14, Section 898*

■   As part of its second cause of action EBMUD argued that title 14, section 898 unduly restricts the range of related projects which must be considered in assessing cumulative impacts. The regulation provides: "The R[egistered] P[rofessional] F[orester]'s and plan submitter's duties under this section shall be limited to closely related past, present and reasonably foreseeable probable future projects within the same ownership and to matters of public record. . . ." (Tit. 14, § 898.) The trial court found as a matter of law that the regulation was "in harmony with CEQA and not in conflict with other laws" and was therefore legally adequate. On appeal EBMUD contends that this ruling was erroneous.

EBMUD maintains that title 14, section 898 impermissibly limits the range of disclosure by requiring disclosure of only those projects (past, present and future) with the same ownership and matters which are part of the public record. It postulates the possibility that the plan submitter or the RPF may know of some matter which would be relevant to cumulative impact assessment, but which might not fall into either category[12]—for example, plans the submitter might have to log adjacent land which it did not presently own.

While we might hypothesize some circumstance in which an RPF or a plan submitter could comply with the letter of the regulation but offend the CEQA principle of considering all possible sources of cumulative impacts, that exercise is not before us on a facial challenge. Moreover, the next sentence in the regulation allocates to the agency the duty to "supplement the information provided by the RPF and the plan submitter when necessary." . . . ." (Tit. 14, § 898.) Considered as a whole the regulation imposes a defined duty of disclosure upon the preparers of the THP, but goes on to require in broad language that "when necessary" those disclosures be supplemented. The duty to require supplementation is entirely consistent with the agency's duty under CEQA to use its best efforts to find out and disclose all it reasonably can. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra*, 151 Cal.App.3d at p. 74.) As written the regulation does not impermissibly restrict the scope of a cumulative impact assessment.

### F. Cost Award

■ By its judgment the trial court awarded costs to defendant CDF and to intervener Georgia Pacific. EBMUD contends that the trial court abused its discretion in denying it costs, because it maintains that it was the prevailing party.

It had sought costs on the ground that it was a prevailing party within the meaning of section 1032. "When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." (§ 1032, subd. (a)(4).)

The judgment entered by the trial court contained four numbered orders: the first found CDF's use of its Guidelines for describing watershed assessment size to be illegal because the Guidelines had not been adopted as

---

[12]EBMUD seems to find some ambiguity in the language of the regulation, suggesting that the only plans which must be disclosed are those both owned by the submitter and already matters of public record. Like the trial court, we find no such ambiguity.

regulations; the second found that CDF's analysis of the cumulative impacts of Georgia Pacific's logging in the Mokelumne River drainage was legally adequate; the third found that the definition of reasonably foreseeable future projects contained in title 14, sections 895.1 and 898 to be legally adequate under CEQA; the fourth awarded costs to CDF and Georgia Pacific.

EBMUD argues that it was the prevailing party in the declaratory relief action because the trial court found the Guidelines to be illegal, underground regulations. Judged against the broad scope of EBMUD's complaint its limited victory is just that. By its first cause of action it sought to establish that CDF had a pattern and practice of improperly assessing cumulative impacts, alleging that the agency had inadequate data on the effects of past harvesting, defined an insufficient watershed assessment area, and failed to include future projects. Its second cause of action challenged the agency's cumulative impact rules. It sought declaratory relief on both causes of action and injunctive relief to halt approval of THP's in the Mokelumne River watershed.

On only one portion of its first cause of action did EBMUD prevail—that is the court's finding that CDF's Guidelines were illegal regulations. Notwithstanding that ruling, however, the court declined to enjoin use of the Guidelines. In its statement of decision the court specifically declined to reach the question of whether the scientific method adopted by CDF for deterring the watershed assessment area was "technically sound, scientifically valid, or the most reliable method." Indeed, it permitted the agency to continue using the guideline method for analyzing cumulative impacts pending its promulgation as a regulation.

We cannot say the trial court abused its discretion in denying EBMUD costs as the prevailing party.

## II. DISPOSITION

The judgment is affirmed.

Poché, J., and Reardon, J., concurred.